## Barnett *et al. versus* Kimmell.

The defendants gave their bond and warrant to the plaintiff, an unmarried woman, who, at the same time, executed a defeasance, conditioned that the same should be void, if one of the defendants should marry the plaintiff within sixty days; a marriage took place between the parties within the time limited, but the husband ever after refused to cohabit with the wife: *Held*, that such a marriage in fact, was a compliance with the condition of the bond.

The validity or invalidity of a marriage cannot be determined in a collateral proceeding between the parties.

The consent of the parties to the alleged marriage is to be determined by what took place at the time of its celebration; and it is not affected by a secret reservation of one of the parties.

ERROR to the Common Pleas of *Cambria county*.

This was a judgment in the penal sum of $600, entered on the 14th June 1858, on a bond and warrant of attorney, in favour of Emma Kimmell against Theodore Barnett and D. Hamilton, conditioned for the payment, by the defendants to the plaintiff, of the sum of $300, within sixty days from the 9th June 1858.

Simultaneously with the execution of this bond and warrant of attorney, the plaintiff executed and delivered to the defendants a defeasance, whereby she covenanted that if the defendant, Theodore Barnett, would marry her within the sixty days limited in the bond for the payment thereof, or offer to marry her and she reject the offer, that then and from thenceforth, the bond should be null and void.

On the 15th July 1858, the parties were married by the Rev. S. E. Babcock, a minister of the Methodist Episcopal Church; and a certificate of the marriage was executed and delivered to the plaintiff by the clergyman. Theodore Barnett, at the time of the execution of the bond, and of the celebration of the marriage, was a minor, and the other defendant was his guardian. From the time of the marriage, Barnett refused to live or cohabit with his wife, or to provide for her in any way.

The facts of the case are fully stated in the following charge to the jury, which was delivered in the court below by TAYLOR, P. J.:—

"On the 9th of June 1858, Theodore Barnett and D. Hamilton, the defendants, executed and delivered to Emma Kimmell, the plaintiff, a judgment-bond in the penal sum of $600, conditioned for the payment of $300, in sixty days, and with stay of execution for that time, upon which a judgment was duly entered on the 14th. The consideration of the bond and the judgment, although not fully disclosed, appears to have been the settlement of some suit or controversy in this court. Barnett, it is agreed, is the principal debtor, and Hamilton, who is his uncle, a surety.

"It further appears, that at the time the bond was given, a

separate agreement was entered into between Emma and Barnett, to the effect that if, within sixty days, he would marry her, or offer to marry her and she reject the offer, he should be released from the obligation of the bond. This paper, which was in the possession of one of the counsel, for some purpose, about the time of its date, as he has testified to the court, appears to have been mislaid or lost; but he and the counsel of the other party agree, and we have noted the agreement, to the contents, in substance, as we have stated.

" Thus the case stood until D. Hamilton, on the allegation that Barnett had, within the sixty days, married Emma, obtained a rule to show cause why the judgment should not be marked satisfied; and upon the hearing of that rule, an issue was directed to determine whether the condition expressed in the agreement had been performed or complied with; and that is the question which, as the issue was moulded by the court, and the agreement of the parties, you have been empannelled and sworn to try.

" It has been shown in the affirmative, and is not disputed, that the parties were formally married with the usual ceremony, in the presence of witnesses, by the Rev. S. E. Babcock, a minister of the Methodist Episcopal Church, on the evening of the 15th of July 1858, within sixty days from the date of the bond. This, it is argued in behalf of the defendants in the issue, was a performance by Barnett (without any regard whatever to his intention at the time, or his conduct then or afterwards), of his agreement.

" On the other hand, it is alleged, that this was, on his part, a concerted scheme to dupe and deceive Emma, planned and executed, not with the intention of assuming in good faith the relation of husband, and of discharging its duties, but with the sole purpose of escaping the obligation of his bond, by complying with the letter of his agreement, and of deserting her as soon as the ceremony was finished, and his purpose effected; and that he did so desert her; and that this cannot be regarded as such a performance of his contract, as in law or equity, should relieve either him or his surety. You will readily remember the facts in evidence, upon which you must form your conclusion. The bond and agreement were executed here at court. From that time until the day before the marriage, Elizabeth Hamilton, the sister of Emma, and in whose family she resided, testifies: ' Barnett did not call to see her or show her any attention; he then called and wanted her to take $40, and release him from the bond; she told him she would give him a receipt on the bond; he said he would not do that, he would marry her; he said all she wanted was the $300, and that she never should have; he said he would make her miserable before David Hamilton should pay $300 for him.' This was on Monday. ' He came again,' she says, ' on Tuesday, about dinner time, and told her she should be

ready about eight o'clock, and he would be down to marry her.' At the time appointed, she testifies further, Barnett, 'squire Shannon, and two others, came to the house; objection, the reason of which is differently stated by the witnesses, but entirely immaterial, was urged against the marriage being performed by Shannon, and the clergyman was sent for. After his arrival, something was said about David Hamilton being opposed to it; the clergyman hesitated, but the family appeared to be willing, and George Hamilton (the husband of the witness, Elizabeth Hamilton, and brother of David) assuring him that he would stand between him and David, he proceeded to marry the parties.

"Soon after the ceremony was over, Barnett left the house, stating that his uncle David (with whom he lived) was from home, and he had to stay with the women; he did not return, and he has not since offered to take or live with Emma, or in any way treat her as his wife; he had previously spoken to 'squire Cohrick of his uncle's opposition to the marriage, and he subsequently declared to Samuel Cogan, as that witness testifies, that 'he'd be d——d if he would ever live with her, or do anything for her.'

"Was this a compliance with the condition expressed in the agreement? That depends, as matter of fact, upon the question, which is for you to determine, whether it was, as it is alleged, including the desertion, a mere scheme to deceive Emma, planned and carried out merely and only to cancel the bond; and as matter of law, to which we must respond, whether, if you so find, it was a compliance with his contract.

"Actual fraud destroys and avoids, so far as it concerns all interests affected, every contract into which it enters. To this we are not aware of any exception. It annihilates the most solemnly concluded deeds, and even records: Mitchell *v.* Kentzer, 5 *Barr* 216; Jackson *v.* Summerville, 1 *Harris* 309. The law regards marriage only as *a civil contract.* Our statutes make 'fraud' by either party consummating it, ground for annulling it, by the decree or judgment of the proper court; and although, until that be done, the parties may be regarded, for some purposes, as husband and wife, it is not perceived why the contract should not be treated as void, so far as questions of property are concerned, like any other contract, in any proceeding where the question is properly raised, and the fraud clearly proved. If this contract has any attribute which renders it impervious to what destroys and annuls all other contracts, we are at a loss to conceive what it is, or to find a precedent or a reason for the distinction.

"But, if it may stand entirely unscathed by what would and should destroy deeds and records, it is a rule of law, in the application of which we can think of no exception, that no one shall

[Barnett *et al. v.* Kimmell.]

be permitted to reap any advantage from or through his own fraud or covin.

"Now, let us suppose it to be here clearly proven (and whether it is or not, is for you to judge)—and in this assumption, for the purpose of argument, we would not be understood as intending to invade your province—that the bond and the agreement were simultaneously executed on the part of Barnett, in pursuance of a concerted scheme to settle a claim against him, or quiet a controversy in which he was involved, with the intention at the time of freeing himself and surety from the obligation incurred, by marrying and then deserting Emma, and that he accordingly did do so, in pursuance of the previously formed purpose. Who will say that it was not a most unmanly and infamous fraud upon her rights? Who will say that, in law or justice, he should be permitted, directly or indirectly, to reap any benefit from his fraud? And, short of this, who will allege that this is the meaning of the word 'marry,' in the agreement, in the mutual understanding of the parties to it, upon its true and correct interpretation? What court, or lawyer, or layman, would so construe it? To define marriage as an empty ceremony, leaving out everything endearing, or binding as duty, which it suggests, or to substitute for these, and include in the definition, fraud and deception, would surely be a perversion of the word.

"But it is suggested, that David Hamilton stands upon more favourable ground than his principal. As respects this question, at least, we do not think so. The bond is absolute, and imports consideration. Relief is sought by virtue of alleged compliance with a collateral agreement, and on that ground alone; and clearly, nothing short of such proof of compliance by the principal as would discharge him, will discharge the surety.

"It is alleged, however, that the marriage, assuming it to be such for all purposes, established a relation between the obligee and the principal obligor, which necessarily relieves the surety. To this we have two answers. Is it entirely clear, in the first place, that the marriage, as the law now stands in Pennsylvania, would have that operation? The bond and judgment import consideration, and evidence a debt for their amount due Emma in her own right, when she was *sole*, as truly and really as if given for money loaned by her. But however this may be, it is sufficient to remark, that the question here now is, not whether the marriage discharges the debt for any other reason, or in any other way, than as a compliance with the agreement; but, was it a compliance with the agreement?

"It is urged, further, that the debt is cancelled, because the marriage, in any view of it, entitles her to claim, against Barnett, the legal rights of a married woman. This would be true, if it were admitted to have been a fraud upon her throughout; but it

[Barnett *et al. v.* Kimmell.]

might be so principally, or only, for that reason. He would not be permitted to shield himself behind his fraud.

"But this is apart from the question, was what Barnett did a performance of his covenant to marry, according to the mutual understanding of the parties, upon a reasonable and correct construction of their agreement? Did she bargain only for the ceremony, or, for the ceremony with the right to claim alimony or dower, and nothing more?

"The points of the defendant, however, are formally presented in writing, and we here introduce and answer them:—

"The court are requested to instruct the jury,

"'1. That if they believe the principal in the bond, Theodore Barnett, in fact did, in due form of law, within the sixty days limited in the agreement between Emma Kimmell, the plaintiff here, and the said Theodore Barnett, marry the said Emma Kimmell, then the terms of the said agreement were, by the act of the said marriage, complied with at the time of the celebration of the nuptials, on the part of Barnett, without respect to his alleged intentions or mental reservations; and their finding should be for the defendant.

"'2. That if the jury believe that Theodore Barnett, the principal in the bond, did, within the sixty days limited in the agreement for that purpose, marry the said Emma Kimmell, the plaintiff here, then said marriage, as matter of law, constituted them husband and wife, without regard to the intention of the said Barnett, at the time of such marriage, and is a bar to her recovery of the $300 mentioned in the bond, as against and from her said husband; and consequently, against her recovery from David Hamilton, his surety therein; and their finding should be for the defendant.

"'3. That if the jury believe the fact of marriage did occur between the plaintiff, Emma Kimmell, and Theodore Barnett, the principal in the bond, within the time limited for that purpose, as testified to by the Rev. S. E. Babcock, then the duties, obligations, and incidents of the marriage relation were cast mutually upon the parties thereto, by their own agreement, and operation of law, without respect to the intentions, at the time, of either party, and the plaintiff here would be cast upon her appropriate remedy at law, for the subsequent violations of any of the duties or obligations of the marriage contract upon the part of her husband, and not against his surety in the bond; and their finding should be for the defendant.'

"For the reasons already stated, we answer these points in the negative. And we instruct you, that if you find this marriage to have been, on the part of Barnett, a concerted scheme to cancel his debt and escape the obligation of his bond, planned and carried through for that purpose alone, and with the intention, also

[Barnett *et al. v.* Kimmell.]

carried out, of deserting her as soon as the ceremony was over, it was not a compliance with his agreement; and you should find for the plaintiff. If the evidence fails to satisfy you of that, you will find for the defendant."

To this charge the defendant Hamilton excepted; and a verdict having been given for the plaintiff, and the court below having, thereupon, refused to direct satisfaction to be entered on the judgment, the defendant Hamilton sued out this writ, and here assigned the said charge for error.

*Kopelin,* for the plaintiff in error.—The court below submitted a question of fraud to the jury, upon evidence wholly insufficient for such purpose. Fraud is not to be implied from doubtful circumstances, which only awake suspicion: *Story on Contracts,* p. 416. There was no evidence at all, as to what took place at the execution of the bond and agreement; and it was, therefore, error to charge the jury, that if they found the bond and agreement were simultaneously executed, on the part of Barnett, in pursuance of a concerted scheme, &c., it was a fraud upon the plaintiff's rights. To leave a fact to the jury, of which there is no evidence, is error: Werkheiser *v.* Werkheiser, 6 *W. & S.* 188; Muirhead *v.* Fitzpatrick, 5 *Id.* 508; Evans *v.* Mengel, 1 *Barr* 82. And it is error to submit it to the jury, to draw an inference, when there is no evidence from which it may legally be drawn: Gilchrist *v.* Rogers, 6 *W. & S.* 488; Urket *v.* Coryell, 5 *Id.* 84.

The court also erred in charging that a design on the part of Barnett, at the time of the marriage, not to live with his wife, was such a fraud upon her rights, as tainted and vitiated the marriage contract, and consequently enabled her to recover on the bond. It is the consent of the parties, and not their cohabitation, which constitutes a valid marriage: *Broom's Legal Maxims,* p. 369; 2 *Bac. Abr.* p. 331.

The marriage extinguished the debt between the principals to the bond: 1 *Inst.* 264; 6 *Rep.* 68. And a wife cannot, in a suit against her husband, treat her marriage as a nullity; she must first establish the nullity of the marriage, by a judicial proceeding for that purpose: Griffith *v.* Smith, 3 *Penn. L. J.* 151.

*R. L. Johnston,* for the defendant in error.—The very able charge of the judge before whom the case was tried, is a sufficient answer to the argument of the plaintiff in error. There was abundant evidence of fraud to be submitted to the jury, and the legal axiom that "fraud vitiates everything it touches," is not more invincible in its application, than the maxim that "the party perpetrating a fraud cannot be benefited by it;" while it would allow the defrauded woman her remedy under the marriage, it will also

[Barnett *et al. v.* Kimmell.]

declare it void for her protection, and as a punishment to the perpetrator of the fraud.

The opinion of the court was delivered by

READ, J.—Theodore Barnett, a minor, with his uncle, David Hamilton, entered into a bond with warrant of attorney to Emma Kimmell, in the penal sum of six hundred dollars, conditioned for the payment of three hundred dollars within sixty days from the 9th June 1858, with stay of execution for that period, and on the 14th June in the same year, judgment was entered upon it. At the same time, and of the same date with the bond, another paper was drawn up and executed by the obligee, and delivered to Hamilton, one of the obligors, in which, after reciting the giving of the bond, &c., it was provided that, if within sixty days, Barnett proposed to marry Miss Kimmell, and was rejected by her, or on the other hand, if his proposition was accepted, and he married her, then and from thenceforth the bond was to be null and void. On the 14th July 1858, they were married in the presence of witnesses, at the house of Miss Kimmell's sister, where she resided, by the Rev. Mr. Babcock, a minister of the Methodist Episcopal Church. Upon a rule taken on the 13th June 1859, on the plaintiff, to show cause why the judgment should not be marked satisfied, the court directed an issue to determine whether the conditions expressed had been complied with, which was tried, and under a strong charge from the presiding judge, the jury gave a verdict for the plaintiff. The fact of marriage was not denied, but it was alleged, that it was accompanied by such circumstances of fraud as to render it null and void; or, in other words, that the parties were not married at all. This is a startling proposition, and requires a careful examination, as it would give the courts the power, in an entirely collateral proceeding, to divorce man and wife.

Barnett, by the obligation, was bound to make the offer to marry. This was imposed upon him as a duty by the plaintiff, and one which she knew he was unwilling to perform. His connections were opposed to the match, and this was well known to the plaintiff, who provided for it, by securing the payment to her of three hundred dollars, in case he did not give her the opportunity, within a limited period, of accepting or rejecting him.

The plaintiff declined taking any smaller sum, and the defendant then proposed to marry her, to which she consented, and they were legally married by the ceremony of the Methodist Episcopal Church. Whatever was said by him immediately before the marriage is immaterial, as it was said to the plaintiff herself, who was fully aware of his feelings; and the loose declarations made three months after his marriage, that he would not live with her, or do anything for her, may be classed in the same category.

The only fact proved to invalidate the marriage was, that since

[Barnett *et al.* v. Kimmell.]

it took place he has not lived with her. This clearly does not render it null and void *ab initio*, or a state of divorce would become the rule instead of the exception.

The Act of the 8th May 1854 empowers the Courts of Common Pleas to grant divorces, where the alleged marriage was procured by fraud, force, or coercion, and has not been subsequently confirmed by the acts of the injured party. In the present case, there was clearly neither force nor coercion, and any fraud between man and wife should only be tried between those parties by the tribunal, and in the manner, pointed out by the Act of Assembly. Mrs. Barnett has never applied for a divorce, nor did she ever deny or repudiate the marriage, until this question of fraud of intention was raised, on the trial of this issue, a year and more after the event itself. It is clear, that Theodore Barnett is a married man, and if he married another woman during the life of his present wife, he would be guilty of bigamy, and if Mrs. Barnett did a similar act, she would be guilty of a like offence.

The contract of marriage differs from all others, in having a specific remedy provided by positive statute, in which its validity or invalidity may be finally determined between the parties. This is necessary for the peace and comfort of society, as well as for the safety and happiness of the helpless progeny.

The learned judge was clearly wrong in submitting to the jury a hypothetical case of conspiracy and fraud in giving the bond, for which there was not the slightest warrant in the evidence, which has been all spread on the paper-book. Prior to the marriage there was really nothing but the unwillingness of Barnett (which was well known to his intended wife) to prove what his real intention was, at the time of the marriage. As was well said by Lord REDESDALE, in McAdam *v.* Walker, 1 *Dow's Rep.* 190 : "There was no proof that Mr. McAdam did not intend a *consortium vitæ*, at the time of the marriage, and even though he had not that intention, still it was not to be allowed, that a civil contract (as this was by the law of Scotland) should be avoided by a secret reservation of one of the parties."

In Jackson *v.* Winne, 7 *Wendell* 47, Copley was arrested under the Bastardy Act, upon the charge of having gotten Joanna Desilva with child; and he went, in company with Joanna, her father, mother, and the constable, to the house of a justice of the peace, to be married. The justice asked Copley and Joanna if they consented to be married, and told them to join hands. Copley dropped his hand and turned from Joanna—she took it, and held it until they were pronounced man and wife. Upon Copley refusing to take the hand of Joanna, the justice hesitated, but, after a minute or two, proceeded, concluded the ceremony, and pronounced them man and wife; Copley, during the whole time, said nothing. Joanna returned to her father's, but Copley

[Barnett *et al. v.* Kimmell.]

did not return with her, and they never cohabited after the marriage. Three days afterwards Copley married another girl; both became mothers within six months of the two marriages, and Joanna married another man during Copley's life. The question was, whether Joanna's child, Parthenia, was legitimate. "It is very evident," say the court, "that the Ecclesiastical Court, in deciding upon the sufficiency of the assent of the parties, can regard only what takes place at the ceremony. We ought, therefore, to confine our attention almost exclusively to the facts attending the espousals before the justice; and doing so, we cannot say, that the mere circumstance that Copley had involved himself in difficulty with the overseers of the poor, by his previous connection with Joanna, and that he took the step he did with some reluctance, is enough to show that he did not yield his full and free assent to the marriage solemnized before the justice. To nullify, on such slight grounds, so solemn a contract as that of marriage, would jeopardize, in too many instances, the blessings which spring from the dearest civil and social relation."

The light in which such marriages were regarded by William Penn, may be seen in one of his earliest laws, which enacts "That if any single man commit fornication with any single woman, he and she shall be punished by enjoining marriage, or fine, or corporal punishment, or all or any of these, according to the discretion of the county court before whom it shall be proved."

The conclusion, then, is, that these parties were legally married, and never having been divorced for any cause whatsoever, the stipulation in the paper, accompanying the bond, has been complied with; and, of course, that the judgment entered on it should have been marked satisfied. Such a result is absolutely necessary, to protect the offspring, whether born before or after the marriage, from the stain and disabilities of illegitimacy.

This view of the case makes it unnecessary to consider the charge of the court in detail, or to discuss particularly the errors assigned.

Judgment reversed, and a *venire de novo* awarded.