MARY SHORTEN *et al.* v. JOHN JUDD, *by his next-friends, William Runkle and Sadie Mott.*

#### No. 10905.

1. IN EQUITY—*Findings of Jury.* In a case of equitable cognizance it is competent for the court to take the advice of the jury upon disputed questions of fact. It may adopt or reject the findings of the jury on issues so submitted, as the evidence may require, and in the end must determine for itself every issue in the case.

2. MARRIAGE—*Per Verba de Præsenti.* Where there are no impediments existing, an agreement and present consent between the parties then to take each other as husband and wife, followed by cohabitation, is sufficient to constitute a valid common-law marriage in this state; and, upon an examination of the testimony, it is held to be sufficient to sustain the finding of marriage made herein.

3. WILL—*Revocation—Statute Construed.* The rule of the common law, that the will of an unmarried man which devises the

whole or substantially all of his estate is revoked by the testator's subsequent marriage and the birth of a child, unless provision has been made for the wife and child, is not abrogated by our statutory provisions regarding the revocation of wills. .

Error from Bourbon district court; J. D. McCLEVERTY, judge *pro tem.* Opinion filed December 10, 1898. Affirmed.

*Perry & Crain,* for plaintiffs in error.

*C. E. Cory,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, J. : This is a continuation of the litigation that was before this court in 1895, the main purpose of which is the setting aside of the will of William Judd, deceased, and the partition of real estate owned by him at the time of his death. (*Shorten v. Judd,* 56 Kan. 43, 42 Pac. 337.) A brief summary of the undisputed facts is that William Judd married Mary Toler on October 10, 1880, and a daughter, Jennie L. Judd, was born to them October 7, 1881. Early in 1882, a separation occurred, which was shortly followed by a decree of divorce, granted because of the fault of the husband, and the divorced wife was awarded alimony in the amount of $1200, which was paid. After the divorce, Jennie lived with her mother, while William Judd lived upon the farm. In January, 1888, he rented the farm to William Runkle, and about April 1, 1888, Sadie Runkle went to the Judd place, where she cooked and kept house for her brother and Judd. She claims that she was married to Judd about that time; but that is one of the matters in dispute. In July, 1886, William Judd made a will in which he devised all his property to the daughter, Jennie L. Judd. On June 11, 1888, he

committed suicide, and soon after his death his will was probated and the executor took possession of the property in controversy. In May, 1890, Jennie L. Judd died unmarried, intestate, and without issue, leaving her mother, who had intermarried with Frank Shorten, as her sole and only heir at law. In February, 1889, Sadie Runkle gave birth to a child, which she named John Judd, and he has been generally known by that name in the neighborhood where he resides. In January, 1889, Sadie Runkle was married to Charles Mott.

In behalf of John Judd it is claimed that he is the legitimate child of William Judd and Sadie Runkle, the only issue of a consensual marriage which occurred about April 1, 1888. It is also claimed that the father's marriage, together with the birth of the child, operated to revoke the will, and that under the law John Judd inherited and was entitled to one-half of the real estate in controversy, his mother having renounced her claim to the property. The disclaimer of the mother made her a competent witness at the second trial, which, like the first, resulted in a finding and judgment in favor of John Judd.

The principal questions to which testimony was directed at the trial were the validity of the marriage which it is claimed was entered into between William Judd and Sadie Runkle, and whether John Judd was the issue of such marriage. A jury was called, to whom two questions were submitted, which, with their answers, are as follows : "Was Sadie Mott, formerly Sadie Runkle, the wife of William Judd at the time of his death?" A. "Yes." "Is the plaintiff, John Judd, the son of William Judd, deceased?" A. "Yes." These findings were approved and adopted by the court, and upon the whole case the court found

as a matter of law that John Judd was the owner in fee simple of an undivided one-half interest in the real estate in controversy, and that Mary Shorten was the owner in fee simple of the other undivided one-half of the real estate, and that Sadie Mott, having renounced and relinquished all interest in the real estate in open court, had no interest therein. Judgment was given accordingly.

No attack is made here upon the form of the action nor any question raised as to the right to the relief which is sought, but the parties make a full submission and invoke the decision of the court upon the validity of the alleged marriage, under the testimony, and as to the effect of the marriage and the birth of John Judd upon the will which had previously been made. Several questions about which there was contention relating to the character of relief to which plaintiff is entitled, and as to the competency of testimony, were decided in the first review and require no further consideration.

The objection to the submission of issues of fact to the jury is not well taken. It may be conceded that neither party was entitled as a matter of right to a jury, but it was competent for the court to take the advice of the jury upon disputed questions of fact. In cases of equitable cognizance it is entirely within the discretion of the court whether any or all the issues of fact shall be submitted to a jury; and even the findings of the jury upon the issues submitted are not conclusive upon the court. It may adopt or reject the findings as the evidence may require, and in the end the court must determine for itself every issue in the case.

It is strongly contended that the evidence did not warrant the finding that William Judd was married

to Sadie Runkle, but we are unable to say that there is no testimony to sustain this finding. The twelve jurors whose opinions were taken found that the parties were actually married, and that John Judd is the fruit of that marriage, and upon the testimony the court below reached the same conclusion. No claim is made that there was a formal marriage, but the contention is that the agreement and conduct of the parties were such as to constitute a valid consensual or common-law marriage. Nothing in our statutes prohibits a marriage *per verba de præsenti*, or at common law, and so it has been held that where there are no impediments existing a present consent between parties then to take each other as husband and wife, followed by cohabitation, is sufficient to constitute a valid marriage. (*The State v. Hughes*, 35 Kan. 626, 12 Pac. 28; *The State v. Walker*, 36 id. 297, 13 Pac. 279; *The State v. McFarland*, 38 id. 667, 17 Pac. 654.) There is the testimony of Sadie Runkle that there was a present consent to an immediate marriage, and that they lived together as husband and wife from that time until the death of Judd. There is much in the testimony and many circumstances opposed to this claim, and which go far to justify the contention of the plaintiff in error that the relation between the parties was wholly meretricious.

If the facts as written in the record were submitted to the writer he would hesitate long before he would hold that there was an actual marriage, or that the parties themselves understood that they had assumed the marriage relation. Among other things, it would seem that no publicity was given to the alleged marriage; she never told her parents, relatives or friends that she had been married — not even her sister, who lived in the Judd house with her a part of the time.

They never introduced or spoke of each other to neighbors or strangers as husband and wife. When she insisted that a marriage ceremony be performed he told her that he could not afford the expense at that time, and yet he was a man who had abundant means. Then there was the circumstance that they contemplated a formal marriage ceremony, and had arranged that it should occur in July following, and later they fixed the time for June 11, the day on which he killed himself. No claim was made by her at the time of his death, nor at the funeral, that she had been his wife, nor was any public claim of that kind made until more than a year afterward, when this action was brought. She never claimed the name of Judd, or was recognized by any other name than Sadie Runkle, until she was married to Mott. Of course, none of these things is conclusive against the claim of marriage, and we recognize the fact that the trial court had a much better opportunity to determine the force of these circumstances and the truth of the statements of witnesses than we have.

In addition to the testimony of Sadie Runkle that they were married and had lived together as husband and wife for about ten weeks, there is the testimony of William Runkle that about the 1st of May, 1888, William Judd told him, in the presence of Sadie, that the marriage had occurred and that they were living together as husband and wife. Charles Reed, who was an employee of William Judd in the early part of 1888, testified that Judd told him that he was going to be married, and, later, and some time in the month of May, upon inquiry of Reed as to how he was getting along, Judd stated that he was all right — that he had a woman now. Shortly before the death of Judd he applied to a physician for medicine to pro-

duce an abortion, and he stated that he had got a woman in trouble and wanted to help her out of it. The doctor suggested that he would better marry the woman, and Judd replied that he would have married her but that he did not want the child. Some other circumstances might be mentioned which would slightly tend to support the claim of marriage, but, taking the whole testimony, the court is unable to say that there is no basis or support for the findings and judgment of the court. Inconclusive as the testimony was, two juries have found that there was a marriage, and the court in each instance has approved and adopted the finding. It may be said that the testimony supporting the marriage was stronger on the last trial than on the first one, and viewed in the light of all the circumstances and the rule which controls the decision of a reviewing court on questions of fact, we would not feel justified in setting aside that finding.

This leaves only the question of what is the proper division of the property in controversy. The will, which was made nearly two years before the marriage, made no provision for the wife, or for the child born after his death. The rule of the common law is that the will of an unmarried man which devises the whole or substantially all of his estate is revoked by the testator's subsequent marriage and the birth of a child, unless provision has been made for the wife and child in the will or by previous settlement. The change of circumstances and condition is such as to raise the presumption that the testator could not have intended that a former disposition of the property should remain in force. By reason of the subsequent marriage and birth of issue, new obligations were created and new moral testamentary duties arose, so that the law

will presume a change of purpose which will amount
to an implied revocation of the will. (29 A. & E.
Encycl. of L. 319; 1 Jarm. Wills, 128.)   It is not con-
tended, nor can it be held, that the common-law
doctrine referred to is abrogated by the statutory pro-
visions concerning the revocation of wills.   The stat-
ute provides that certain alterations shall operate as
a revocation, and also that if the testator had no
children at the time of executing his will but shall
afterward have a child living or born alive after
his death, the will shall be deemed revoked.   It
is also provided that a will may be revoked by
tearing, canceling, obliterating or destroying the
same with the intention of revoking it, or by an-
other will or codicil in writing properly executed.
As a restriction upon bequests the statute also pro-
vides that no husband or wife can bequeath away
more than one-half of his or her property without the
consent of the other.   (Gen. Stat. 1897, ch. 110,
§§ 34–37, Gen. Stat. 1889, ¶¶ 7238–7241.)   As in-
dicating that the revocations provided for are not
deemed to be exclusive of implied revocations, the
statute provides : "But nothing herein contained shall
prevent the revocation implied by law from subse-
quent changes in the condition or circumstances of the
testator."   This provision clearly recognizes implied
revocations, and is equivalent to an express enactment
that the common-law rule as to implied revocations
resulting from a change of condition or circumstances
remains in force.   Of course the rule can have no
force as to such changes or conditions as are expressly
provided for in the statute ; but as to all others we
must assume from the language of the provision
quoted that the legislature had in mind the rules of
the common law applicable to such cases, and there-

fore that it was intended that the marriage of a man and the birth of a child would operate to revoke a will previously made. While provision is made for a posthumous heir where the testator had no child at the time of executing the will, and also for cases where he has children but a child is born after making a will ( §§ 36, 39, *supra* ), no provision is made for cases where a marriage and the birth of a child conjointly occur after the making of the will.

Our conclusion is that the rule of the common law in such cases is not affected by the statutory provisions, and that it operates in this instance to revoke the will of William Judd. The will must therefore be deemed to be without force or validity, and the distribution of the estate must be made in accordance with the rule in cases of intestacy. Sadie, who was the wife, is effectually barred from claiming or taking any share in the estate by her disclaimer and renunciation. So far as the distribution of the estate is concerned she has stepped aside, and cannot now or at any future time claim a wife's or widow's share. The distribution must be made as though the marriage relation had not existed between herself and William Judd. The children, Jennie L. and John Judd, were, while living, to be treated as the only heirs of the estate, and each was therefore entitled to one-half of the property in controversy. By reason of the death of Jennie L. Judd, the mother, Mary Shorten, inherits her share. The district court made a division upon this basis, awarding one-half to Mary Shorten and the other half to John Judd. Its judgment will therefore be affirmed.