LON LEE v. THE STATE.

No. 2647. Decided December 17, 1902.

1.—Rape by Means of a Sham Marriage—Evidence—Defendant's Second Marriage.

On a trial for rape alleged to have been committed on July 7, 1901, where it appeared that the crime was accomplished by means of a sham marriage, it was competent, as going to show the intent and motive of defendant, and his purpose not to consummate a valid marriage with prosecutrix, that nine months thereafter he was legally married to another woman. Davidson, Presiding Judge, dissents.

2.—Same.

On a trial for rape accomplished by means of a sham marriage, it was error to force defendant to testify as to his second valid marriage, that, in the latter marriage he had abducted his wife from her home and, against the will and consent of her parents, had run away with and married her.

3.—Same—Bill of Exceptions to Evidence.

On a trial for rape, a bill of exceptions shows no error which states, that

defendant offered to prove by a certain witness that, at a time mentioned, about 9 or 10 o'clock at night, he (witness) went to a hotel and saw defendant and also a woman in defendant's room whom he did not recognize.

**4.—Same—Common Law Marriage.**

On a trial for rape, where it appeared that defendant, by means of a sham marriage, obtained prosecutrix's consent to occasional acts of carnal intercourse, but did not live, cohabit with or otherwise recognize her as his wife, this did not constitute a common law marriage. Mere words, without any intention corresponding to them, will not make a marriage or any other civil contract. The parties must mutually agree to the same thing to constitute a valid contract. See dissenting opinion of Davidson, Presiding Judge.

**5.—Same—Rape by Fraud or Stratagem—Construction of Statute.**

Article 636, Penal Code, which reads, that where the rape is accomplished by fraud "the fraud must consist in the use of some stratagem by which the woman is induced to believe that the offender is her husband," embraces a fraud upon a single woman, who, by means of a sham marriage, is induced to believe she is the wife of the man she is cohabiting with.

**6.—Same—Hearsay Evidence.**

On a trial for rape, the court did not err in refusing to permit prosecutrix to testify to a conversation she had with defendant, in which she told him of certain charges made by an uncle of hers, to the effect that she and defendant had been criminally intimate, and for which defendant had hunted up her uncle and whipped him. Such evidence was hearsay and inadmissible.

**7.—Same—Reputation of Prosecutrix for Chastity.**

On a trial for rape, where a witness has testified that the reputation of prosecutrix for chastity was bad, according to the statements made to him by a number of witnesses, whom he named, one of whom was a certain Bob H.; Held, that it was not competent to prove by the witness that he, Bob H., had told him that he had repeatedly had carnal intercourse with prosecutrix prior to her sham marriage to defendant. The testimony was hearsay and inadmissible. Davidson, Presiding Judge, dissents.

Appeal from the Criminal District Court of Dallas. Tried below before Hon. Charles F. Clint.

Appeal from a conviction of rape; penalty, twenty years imprisonment in the penitentiary.

All the essential facts can be fully seen from the two opinions below, and no other statement is required.

*J. C. Muse* and *J. C. Kearby,* for appellant. [No brief for appellant has come to the hands of the Reporter.]

*Rob't A. John,* Assistant Attorney-General, for the State. [No brief for the State with the record.—Reporter.]

BROOKS, JUDGE.—Appellant was convicted of rape, and his punishment assessed at confinement in the penitentiary for a term of twenty years.

The indictment charges the crime to have been committed on the 7th day of July, 1901, by the use of force, threats and fraud. The following is substantially the facts proved: Prosecutrix, about 22 years of age, lived at Coppell, a small village in Dallas County. Appellant was keeping a saloon for his father, and frequently visited the prosecutrix, Rosa Parrish. Appellant was about 20 years of age. After associating together for some time they came to Dallas on July 7th. Prosecutrix states that, after reaching Dallas, appellant took her to the Alamo Hotel,

secured a room, and after awhile came back with a party, whom he introduced as Rev. Brown. Thereupon, in the presence of some of the inmates of the hotel, said Brown proceeded to perform the rites of matrimony between prosecutrix and appellant. Appellant said he had secured a license in Cleburne, Johnson County, authorizing said marriage. After the marriage was performed said Brown wrote out what was said to be a certificate, certifying to having performed the marriage, and gave the license, with the certificate, to appellant, for which service appellant paid said Brown some money, but she did not know how much. Thereupon the parties who witnessed the marriage, together with the minister, departed, and she and appellant went to bed in the room, and stayed there three or four hours. They then went back to prosecutrix's home, some sixteen or seventeen miles from Dallas, stopping on the way at a physician's to stay all night. Prosecutrix was accidentally shot in the leg just before reaching the physician's, and they stopped there for medical assistance. After prosecutrix returned home, appellant accompanying her, he left. A short while after this appellant went to San Antonio and from there various letters were written, making the utmost asseverations of love and fealty on the part of appellant to prosecutrix. However, after returning from San Antonio, appellant informed prosecutrix that he had received a letter from said Brown, who was reputed to have performed the marriage ceremony, informing appellant that the marriage was a farce, and that he was not a clergyman, nor did he have any license to perform the marriage. This letter was shown to prosecutrix by appellant. Prosecutrix, however, states that appellant pacified her over this condition under assurance that he would rectify the matter as soon as he should be able by a legal marriage, and would make her his wife. Subsequent to his going to San Antonio he came back to Dallas, and lived there for some time. From Dallas he also wrote various letters to her, still protesting fealty and love, promising to bring her to live with him after awhile. On several occasions prosecutrix visited appellant in Dallas, and stayed in hotels all night with him. In the latter part of October or first of November they stopped at the National Hotel. Mrs. Ray, the proprietress thereof, testified that appellant introduced prosecutrix to her as Mrs. Rosa Parrish. This was prosecutrix's real name. The clerk of the hotel testified that appellant told him prosecutrix was his wife, and they occupied the same room at the hotel. On another occasion they went to a boarding house run by Mrs. Rath, and appellant there told his name as Parrish and that prosecutrix was Mrs. Parrish. At this place he secured for prosecutrix and himself a week's board, paying for the same in advance. Prosecutrix stayed there three days, and left with him. They left the house during the night, upon ascertaining the fact that Mrs. Rath had discovered their deception. There is a great deal of evidence on the part of appellant going to show that prosecutrix had been intimate with him prior to the 7th of July, the date alleged in the indictment. He also denies in toto any mock marriage or cere-

mony at the Alamo Hotel. The evidence further discloses that some time after this transaction for which appellant is being prosecuted he was married to another woman.

The first bill of exceptions complains that the court erred in permitting the State to prove by J. M. Skelton, justice of the peace in Dallas County, that on April 6, 1902, witness, as such justice, under a marriage license issued from the county clerk of Dallas County, solemnized the rites of matrimony between defendant Lon Lee and Ella Lee. He also objected to introduction of the marriage license. Appellant insists that said testimony was irrelevant and immaterial and impertinent, and tends to show another offense committed by defendant, and that said evidence was calculated to create a prejudice in the minds of the jury against defendant; and because said marriage between defendant and Ella Lee is not and can not be an issue in this case, or as tending to shed light upon the rape charged in the indictment. The rape alleged to have been committed was on July 7, 1901; and the fact that appellant on the 6th day of April, 1902, married another woman, is a circumstance that might be properly considered by the jury in passing upon the intent, purpose, and motive of appellant at the time that the rape is alleged to have been committed,—that is, it is a circumstance going to show that he had no motive or purpose of ever consummating the marriage at any time. Its probative force is a question for the jury.

Bill number 2 complains that the court erred in forcing appellant to testify that he went to Arkansas for his wife, and to various and sundry matters going to show that he had abducted his wife from the home of her parents, against their wish, will, and consent, and ran away with her, and brought her to Dallas, and married her. These circumstances would not be germane to any issue being tried, and would be introducing, as appellant insists, other offenses or acts that shed no light upon the crime for which he is being prosecuted.

The third bill insists that the court erred in the following: Appellant introduced Jones Paynes, who testified that he knew appellant, and that in the latter part of October or the first of November, and late in the evening, "he saw them going to the National Hotel, in the city of Dallas, situated on Pacific Avenue." That on that night about 9:30 or 10 o'clock he went to said hotel, and to defendant's room, and knocked on the door. Defendant opened the door, and talked with witness, and he saw a woman in the room. Counsel asked said witness how defendant was dressed when he came to the door, and whether or not he was undressed. The State objected to said testimony, and the court sustained the objection. Appellant offered to prove that witness saw a woman in the room, but did not recognize her. We see no connection that this testimony may have with the other facts of this case. It is true, as above stated, the bill of exceptions shows that the witness testified "that he saw them." There is nothing shown by the bill as to whom this relates. Clearly, if appellant went to the National Hotel

with prosecutrix, and there are circumstances showing that prosecutrix was in the bed with appellant, it would be proper to permit the testimony to be introduced, but the bill does not show that any error was committed.

Appellant insists that the court erred in failing to peremptorily instruct the jury to return a verdict of not guilty, for that, under the testimony of Rosa Parrish, defendant and Rosa Parrish were lawfully married in accordance with the laws of Texas. As we understand appellant, he insists that the evidence of prosecutrix makes out a lawful marriage under the laws of Texas. Appellant justly insists that there can be marriage in Texas without a license, as provided by the statutes, since the decisions hold that the statute authorizing licenses to marry does not inhibit a common law marriage without license. In Simon v. State, 31 Texas Crim. Rep., 186, we held that all that can be required in any case involving marriage is proof of a valid marriage, for the violation of which the parties thereto may be punished, whatever be the form of the ceremony; or if there be no ceremony, if the parties agree presently to take each other for husband and wife, and from that time on live professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding on the parties, which would subject them to legal penalties for the disregard of its obligations. An inspection of the evidence in said case discloses that the parties lived together, acknowledging each other as husband and wife, for years after the consummation of the marriage. In Ingersol v. McWillie, 9 Texas Civ. App., 543, Chief Justice Lightfoot, delivering the opinion of the court, after commenting upon the failure to get a license, said: "Of course no such excuse can be shown now for a failure to observe all the rules and regulations prescribed by law and sanctioned by an enlightened people and Christian civilization, but the policy of the law in protecting parties who have innocently been led into such a marriage is the same. From the testimony in this case we think there can be no doubt that Hortense Dix, an inexperienced and confiding girl, just from school, and who had a right to look to A. R. Collins as a protector, was induced to enter with him into the marriage state, under the agreement of present marriage, he giving some business complications as an excuse for not making it public by license and public ceremony. They lived and cohabited as husband and wife, and he introduced her to his friends as his wife, thereby admitting the marriage. She bore him a child, as his wife. While living he did not repudiate the relation." This case cites a great many authorities supporting the validity of common law marriage, where there is no statutory inhibition, and holds that in this State a valid common law marriage can be had. "Mere words, without any intention corresponding to them, will not make a marriage or any other civil contract. But the words are the evidence of such intention, and if once exchanged it must be clearly shown that both parties intended and understood that they were not to have effect." McClurg v. Terry, 21 N. J. Eq., 227. And this is the effect of all the authorities to which

we have had access. G. H. & S. A. Ry. Co. v. Cody (Texas Civ. App.), 50 S. W. Rep., 135; Holder v. State, 35 Texas Crim. Rep., 19. It will be seen from an inspection of the authorities that the bare statement of a man to a woman that they take each other -for husband and wife, without cohabiting together and recognizing each other as husband and wife, would not make a common law marriage. Marriage is like any other civil contract. The minds of the parties must meet. They must mutually agree to the same thing. There is no authority supporting appellant's contention. However, some of the decisions state that where a marriage is entered into by fraud, and the parties subsequently live together as husband and wife, recognizing that relation to the public for any number of years, it would still be a legal marriage. These decisions, however, are based upon the proposition that either party to a fraud in a contract can waive the fraud by their acts and conduct. In this respect we do not understand there is any difference between a marital contract and any other kind.

Now, reverting to the facts, we hold that, if the testimony of the prosecutrix be true, appellant, through fraud, procured prosecutrix's consent to casual and occasional cohabitation, and she returned to her home; he never lived with her; did not hold her out to the world as his wife, and the evidence conclusively shows that he had no such purpose or intent. Could it be insisted that if appellant had fled from the country after July 7, 1901, after perpetrating upon prosecutrix what she details, he could insist in a court that he was the husband of prosecutrix? Clearly not; since, as stated, if her testimony be true, he had no purpose or intent of ever consummating the marriage or holding prosecutrix out to the world as his wife. The fact that he took her to the Alamo Hotel, which the evidence shows was an assignation house, shows that he had no legitimate intent. We therefore hold that the evidence does not make a common law marriage, as insisted by appellant, and the court did not err in so ruling.

Appellant furthermore insists that the court erred in not instructing the jury to acquit because there was no evidence of rape by force or threats, and that the State's case hinged upon the theory of a fraudulent impersonation by defendant as the husband of Rosa Parrish, and, if not married, the facts disclose no offense, for that since a rape by such means is under the statute applicable alone to the protection of married women. In support of this proposition appellant cites King v. State, 22 Texas Crim. App., 652; Franklin v. State, 34 Texas Crim. Rep., 203; Milton v. State, 23 Texas Crim. App., 204; Melton v. State, 24 Texas Crim. App., 286; Mooney v. State, 29 Texas Crim. App., 258; Payne v. State, 38 Texas Crim. Rep., 494. These cases appear to support appellant's contention; but an inspection of the statement of fact in each instance shows that these were prosecutions for rape by fraud upon a woman theretofore married—that is, a woman married to a person other than appellant—and the decisions merely hold in that character of prosecution that the indictment should show the woman

was a married woman. Article 633, Penal Code 1895, defines rape as follows: "Rape is the carnal knowledge of a woman without her consent, obtained by force, threats or fraud," etc. Article 636 reads: "The 'fraud' must consist in the use of some stratagem by which the woman is induced to believe the offender is her husband." From these articles this court would not be authorized in holding that the woman upon whom fraud is practiced, in order to secure her consent to an act of copulation, must be a married woman in every instance. This would be a strained construction; in fact, would not be a construction at all, but an interpolation upon the statute. This is not warranted in construing any law. Nor can we say that the Legislature intended to permit fraud practiced upon a single woman not to be rape when the same fraud would be rape if practiced upon a married woman. If the fraud is such as to cause the woman, whether legally married or unmarried, to give consent to the act of copulation, believing she is the wife of the man she is copulating with, it is nevertheless rape whether the woman be married or single. We therefore hold that the court did not err in refusing to charge the jury as insisted by appellant.

Appellant insists that the following portion of the court's charge is erroneous, to wit: "In this case the means charged to have been used in committing the alleged rape is fraud. The fraud must consist in the use of some stratagem by which the woman is induced to believe the offender is her husband. It is a presumption of law which can not be rebutted by testimony that no consent was given when the intercourse was had by fraud as above defined. Stratagem means the use of any artifice or trick, and to constitute the fraud essential to render the act of copulation rape the stratagem resorted to must have been intended by the offender to induce, and must have induced, the injured female to believe that the offender was her husband." And again: "If you believe from the evidence beyond a reasonable doubt that in Dallas County, Texas, on or about July 7, 1901, the defendant did represent to Rosa Parrish that he had procured a marriage license to marry her, and that he carried her to the Alamo Hotel, in the city of Dallas, to marry her, and that he sent out for a person authorized to marry them, and had brought into the said hotel the person introduced by the defendant to the said Rosa Parrish as a minister of the gospel, and had said person perform the marriage ceremony and marry him, the defendant, to the said Rosa Parrish, and that by virtue of the said ceremony said Rosa Parrish believed, and was induced thereby to believe, that the defendant was her husband, and that the defendant intended by telling her of said marriage license, and sending for and introducing said person as a minister, and having him perform the marriage ceremony, to believe that he was her husband, and that defendant resorted to said acts for the purpose of having carnal knowledge of the said Rosa Parrish, and that he did by said means have carnal knowledge of her, and that she submitted to his embraces, believing then and there that he was her husband; and you further find that said marriage ceremony was a sham, and

said marriage a mock marriage, and that defendant then and there knew it to be a sham and mock marriage; and you further find that defendant was then and there an unmarried male person over the age of 16 years, and that said Rosa Parrish was then and there over the age of 14 years,— then the defendant would be guilty of rape as charged, and you will so find, affixing the penalty therefor." Appellant objected to said charges, because the definition of fraud was not applicable to the facts of the case, and because, if there was no statutory or common law marriage, Rosa Parrish was not a married woman, and the statute has relation only to the protection of married women. These questions have all been reviewed above, and the charge as copied is responsive to what has been heretofore stated. We think the charges are correct. We do not believe that appellant could justly insist that the court should define common law marriage under the laws of this State, because, in our opinion, the evidence does not raise this issue.

Appellant insists in the fifth bill of exceptions that the court erred in admitting the testimony of prosecutrix, the substance of which is detailed above. Without passing seriatum upon the several questions raised, since they have been discussed above, we will merely say that the evidence offered by the State was germane to the issues to be proven, and appellant's exceptions, as contained in said bill, are not well taken.

By the sixth bill it is made to appear that Rosa Parrish was introduced as a witness by the State, and the defendant upon cross-examination proved by her that she had an uncle by marriage by the name of Tom Stringfellow, and that she had a conversation with defendant about Stringfellow. At this point the jury were retired, and the following questions and answers were elicited: "Did you ever have a conversation with defendant concerning certain charges that your uncle, Stringfellow, had made against you and defendant, in which he reported that he had followed you and defendant or knew where you entered in a cornfield; that you had lost your handkerchief there, and that he had found it; and it looked as though you all had laid down in the field; and that he was telling it around the country that you and defendant were criminally intimate; and is it not true that you told defendant about it?" The witness answered, "Yes, sir." "Did you not know that defendant afterwards hunted Stringfellow up and whipped him for it?" To which witness answered, "Yes, sir." "The court: When was that time? Ans. I do not remember the date. The court, to defendant's counsel: I do not think it would be relevant evidence unless you had the man himself here." This testimony would be hearsay, as indicated by the court, and there was no error in excluding the same. The same character of testimony was offered to be proved by Rosa Parrish with reference to another uncle by the name of Frank Parrish. None of this testimony was admissible.

The seventh bill complains of the following: Appellant introduced witness Huggins, and asked: "Are you acquainted with Rosa Parrish, and were you acquainted with her and her general reputation for chastity and virtue prior to July 7, 1901, in the community in which she lived?"

He answered, "Yes; and that her reputation in that regard was bad." Upon the cross-examination by the State said witness was asked if he had heard anybody speak or talk about the general reputation of Rosa Parrish for chastity and virtue, and he answered in the affirmative. He was then asked to name the persons with whom he had talked touching such reputation, and the witness named a number of parties, among them Bob Hardcastle. Defendant, upon redirect examination, asked the witness to state what the several parties had said to him touching the general reputation of Rosa Parrish for chastity. On objection by the State the witness was not allowed to answer. Defendant then offered to prove by said witness that Bob Hardcastle, with whom he had talked, had told witness that he (Hardcastle) had repeatedly had carnal intercourse with said Rosa Parrish prior to July 7th. This was hearsay testimony, and the court did not err in excluding it.

Appellant tendered various charges to the court, which were refused, and after a careful review of the same we do not think the court erred in so doing. The record before us is very voluminous, but we have attempted to pass upon every feature raised by appellant.

Because the court allowed the State to force appellant to testify to the mode, manner, and means of securing his wife in Arkansas and bringing her to Texas, which testimony was calculated to prejudice defendant before the jury, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

DAVIDSON, Presiding Judge (Dissenting).—I desire to give some reasons why I can not concur with my brethren in some of the conclusions set forth in their opinion.

I concur in the reversal, for the reasons assigned in sustaining bill of exceptions number 2. I dissent from refusal to reverse the judgment on the matter set up in bill of exceptions number 1. The same reasons apply for admitting the testimony in this bill as to that admitted in bill number 2. I am unable to perceive the relevancy of appellant's subsequent marriage to Ella Lee to the rape of Rosa Parrish. The court says: "The rape alleged to have been committed was on July 7, 1901; and the fact that appellant on the 6th day of April, 1902, married another woman is a circumstance that might be properly considered by the jury in passing upon the intent, purpose, and motive of appellant at the time that the rape is alleged to have been committed—that is, it is a circumstance going to show that he had no motive or purpose of ever consummating the marriage at any time. Its probative force is a question for the jury." How the issuance of the license on the 6th of April, 1902, to one woman, could tend to show motive for the prior rape upon another woman, is not apparent. If the doctrine announced be correct, then every marriage subsequent to a rape becomes legitimate evidence upon the trial of the previous rape, if the alleged rapist is party to such marriage.

The court instructed the jury, in substance, that the testimony of

Rosa Parrish, if true, would constitute a rape by fraud. Appellant, on the contrary, insisted that, if her testimony was true or believed by the jury, he would be entitled to an acquittal upon two grounds: First, it was a marriage; and second, the facts could not constitute a rape by fraud; to which may be added, third, that it could in no event be rape, because she consented to the act of carnal intercourse. In order to bring this question clearly in review, it is necessary to make a substantial statement of the facts bearing on the question of marriage. Some of the most material facts bearing on the question of marriage are omitted in the opinion.

Rosa Parrish testified that appellant told her that he was 21 or 22 years of age—something a year older than herself; that on the morning of July 7, 1901, he came to her mother's residence (who was a widow), and requested her to attend a campmeeting; that after they had gotten in the buggy and started for the supposed campground appellant urged her to go with him to Dallas, a distance of some eighteen miles, and marry him; that she agreed to this proposition. After reaching Dallas appellant registered their names at the Alamo Hotel, but she was not advised as to the names placed on the register, as she did not look to see. "Defendant said we would go to the hotel and be married there; get a minister and witnesses, and be married there. I think we must have stayed there three or four hours. While we were there he took me to a room, and went out and got a minister and witnesses, and we were married. He introduced the minister to me by the name of Brown. He brought in two witnesses. He introduced them, but I don't remember their names. They were a man and a woman. He said it was the man and his wife of that hotel. I don't remember their names. I had been in that room just a few minutes when defendant went down and got the minister. Defendant took me to the room, went out, and was gone some little time, and he came back with the minister and the two witnesses, and we were married there, and the minister wrote out the certificate and gave it to him, and the witnesses signed their names. The minister wrote out the certificate on the dresser—there was no table in the room. He did that in the same room we were in. He gave the certificate to Lon Lee. The minister had a marriage license to authorize him to perform that ceremony. He kept the license. I did not read it, and don't know what was in it. I don't know whether this man was a minister or not. That occurred on Sunday. Lon Lee claimed that he got the license at Cleburne. He paid the minister a fee, but I don't know how much. He paid him a bill. That ceremony was performed in Dallas County, Texas. After the ceremony was performed, the minister and witnesses went out of the room. I don't know where they went. Defendant and I stayed in that room three or four hours after the minister left. We stayed there some time, and then went home. I had carnal intercourse with defendant in that room, in the bed. I believed I was his wife at the time I let him have carnal intercourse with me." Later in the evening they re-

turned in the direction of their home, which was near Coppell, in Dallas County. En route defendant's pistol was discharged, wounding prosecutrix, which compelled them to stop overnight at Dr. Butler's. She further says: "I had an understanding with defendant that our marriage was to be secret. We agreed to that as we came to Dallas. Defendant said he was unable to take a wife then, because he was considerably in debt, and then he said he was going away, and he wanted me to marry him before he went away. I agreed to that. At the time of this ceremony Lon Lee was a single man and I was single. After that marriage defendant said we would have to keep it secret until he was able to provide for me. He afterwards told me that the man who performed the ceremony was no minister. I do not remember exactly when it was he told me that, but think it was in November of last year (1901). I kept insisting that defendant tell that we were married, and he always made excuses for not telling it, and then showed me a letter he received from this man that married us, and he said he was no minister, and the marriage was all a fraud. Defendant has that letter, or had it at the time I saw it. I read the letter. Defendant said he had received it from the man that married us. Defendant said he thought it was all right, and we were married, and that we would marry again. He made that statement to me some time in November, as well as I remember." Shortly afterwards appellant went to San Antonio, and from there wrote prosecutrix quite a number of letters, professing the greatest love and fealty on his part toward the witness. One of them is as follows: "My Dearest Girl: On surprise of myself as well as you, I leave for Dallas to-day to accept a position. I didn't know that I was going until last night, as I received a telephone message to come at once. Papa will go to Childress in my stead, but after the building is completed, then I will take charge of the business, and we will go to housekeeping. Pet, don't become worried, trust in me, and I shall be true and loyal to you." It seems there was an understanding between appellant and his father that the father would secure a building at Childress, where they were to engage in the saloon business. Appellant was to take charge of the business, and this is the matter referred to in this letter. While appellant was in Dallas, at his solicitation prosecutrix several times visited and stayed with him at different hotels, where they registered as man and wife, not, however, under the name of Lon Lee and wife, but under some other name. At the hotel conducted by Mrs. Rath appellant registered himself and prosecutrix as "Mr. and Mrs. Parrish," where they remained from Sunday evening until Wednesday night. He held her out at this hotel as his wife, as he did at all of the other hotels where they registered. While there prosecutrix asked Mrs. Rath to call her husband next morning at 5 o'clock. During the conversation Mrs. Rath said something to prosecutrix which led her to believe that Mrs. Rath thought their name was not Parrish, but Lee. Prosecutrix called appellant's attention to this, and told him that she would not remain in the hotel un-

less he straightened the matter and told the truth about it, and inform Mrs. Rath of their real status. This he declined, and at witness' request they left and registered at the "Windsor Hotel." It was at defendant's suggestion they went by the name of Parrish at Mrs. Rath's. She says: "He told that to Mrs. Rath, the landlady. I came away the next morning after she found out what his name was. I don't know how she found out his name. I didn't stay there any longer, because he would not explain matters to her, and I told him I would not stay unless he did. I wanted him to tell her that were were married, and the circumstances of the case, and he would not do it." It is not necessary to enter into details as to the various times he registered themselves as man and wife at hotels in which he held her out at those different places as his wife. The last of these occurred about the middle of March, 1902. A child was born to them the latter part of April, 1902.

Further, as bearing upon the question of the marriage, and appellant's recognition of the marriage to prosecutrix, witness Pinson Howell testified: "I know Miss Rosa Parrish, and have known her all my life. I remember hearing of her being shot on July 7, 1901. I heard Lon Lee speak about the matter. I believe it was in his place of business when he spoke about it, in his father's saloon, where he worked. He said the shooting occurred at some place east of Farmer's Branch. He told me that he and Rosa Parrish had started to White Rock that day, to a campmeeting. After that I had some little conversation with defendant in reference to Rosa Parrish. He spoke to me about being married to her. That was some time before last Christmas, 1901." "He simply said that he and Rosa Parrish were married, is all that I know. I could not say how they were married. He just said they were married. It is true that defendant, Lon Lee, told me that he had been secretly married to Miss Rosa Parrish. He said he guessed they would go to housekeeping pretty soon." On cross-examination this witness states that he had heard of two fights appellant had had—one with Frank Parrish, uncle of prosecutrix, in regard to her, and the other was with Stringfellow, another uncle of prosecutrix. "It was about that time or after that that I had this conversation with him. He told me that she was his wife. He told me that he was married to Miss Rosa Parrish; I know that."

Along the same line, Brice, a police officer of the city of Dallas, testified, that he was acquainted with defendant, and knew him by the name of Lonnie, while he was working at the Ivy House by the Katy depot. "He and I have talked together quite often. I used to go over there often, and we talked. Some time during the fall of last year [1901] I was in there talking to him one day, and there was a lady in the restaurant. I told him there was a party wanted to see him, and he said, 'Wait a minute;' and I just remarked, 'That is quite a good looking girl.' He said, 'Yes, that is my wife.' And I said, 'I beg your pardon.'" It is unnecessary to further recite acts and conduct of the

parties in regard to. this question of marriage, except as to the fact of the acts of intercourse occurring. These occurred whenever desired by appellant, and he states that "after July 7th, and before I came to Dallas, I had intercourse with her whenever I desired, and did it very frequently. I did not make any note of the times. I would not try to mention the number of times." Prosecutrix testified, in substance, as did appellant.

As the writer understands the law, these facts constitute marriage. If the license was issued and the minister performed the ceremony would be valid under the statute. If not by virtue of the license, then it will clearly come within the essentials of a common law marriage. Ingersol v. McWillie (Texas Civ. App.), 30 S. W. Rep., 58; Coleman v. Vollmer (Texas Civ. App.), 31 S. W. Rep., 413; Chapman v. Chapman (Texas Civ. App.), 32 S. W. Rep., 564; Id., 41 S. W. Rep., 533; Simmons v. Simmons (Texas Civ. App.), 39 S. W. Rep., 639; Cumby v. Garland (Texas Civ. App.), 25 S. W. Rep., 673; Railway v. Cody (Texas Civ. App.), 15 S. W. Rep., 136; Soper v. Halsey, 85 Hun, 464, 33 N. Y. Supp., 105; Cuneo v. De Cuneo, 59 S. W. Rep., 284, 1 Texas Ct. Rep., 306; Bull v. Bull (Texas Civ. App.), 68 S. W. Rep., 727; McClurg v. Terry, 21 N. J. Eq., 227; Holder v. State, 35 Texas Crim. Rep., 19; Simon v. State, 31 Texas Crim. Rep., 186; Robertson v. Cole, 12 Texas, 361; Mixon v. Cattle Co., 84 Texas, 411; Johns v. Johns, 44 Texas, 40; 13 Moore P. C., 242; Barnett v. Kimmell, 35 Pa., 13; Jackson v. Winne, 7 Wend., 47, 22 Am. Dec., 563; Tartt v. Negus (Ala.), 28 So. Rep., 713; Mickle v. State (Ala.), 21 So. Rep., 66; Sharon v. Sharon, 79 Cal., 633, 22 Pac. Rep., 26, 131; Shorten v. Judd, 60 Kan., 73, 55 Pac. Rep., 286.

My brethren hold the marriage testified by the girl to be a "farce and mockery;" "that the minds of the parties did not meet;" that they did not mutually agree to the marriage.

I find this statement in the opinion: "Now, reverting to the facts, we hold that, if the testimony of the prosecutrix be true, appellant, through fraud, procured prosecutrix's consent to casual and occasional cohabitation, and she returned to her home; he never lived with her; did not hold her out to the world as his wife, and the evidence conclusively shows that he had no such purpose or intent. Could it be insisted that if appellant had fled from the country after July 7, 1901, after perpetrating upon prosecutrix what she details, he could insist in a court that he was the husband of the prosecutrix? Clearly not, since, as stated, if her testimony be true, he had no purpose or intent of ever consummating the marriage or holding prosecutrix out to the world as his wife. The fact that he took her to the Alamo Hotel, which the evidence shows was an assignation house, shows that he had no legitimate intent. We therefore hold that the evidence does not make a common law marriage, as insisted by appellant, and the court did not err in so ruling."

I take issue with my brethren upon several propositions included in this short excerpt. I insist it is a correct deduction that had appellant "fled from the country" after the events occurring at the Alamo Hotel, he was nevertheless the husband of prosecutrix. If there was a marriage, and an actual consummation of that marriage by cohabitation before they left the hotel, his flight could not alter the status thus brought about. The contract was consummated. That their minds met, that it was a mutual agreement, that the marriage was insisted upon by appellant—brought·about by his earnest solicitations—the facts make unquestionably true, if the testimony is to be believed. Marriage is like any other civil contract, and governed by the same rules as to fraud. But the rule in regard to fraud has here been subverted, and the party perpetrating the fraud is justified in taking advantage of his own wrong, to the disgrace and infamy of the innocent victim, who contracted the marriage in good faith. I have searched authorities for a decision sustaining the proposition that under circumstances of this character a man can perpetrate such a fraud upon a woman through the solemnization of the marital ceremony, and after cohabitation himself declare the marriage a nullity. There are authorities· which tend to support the theory that the woman, the innocent and injured party, might take advantage of the fraud by divorce proceedings, if she promptly acted upon her knowledge of the fraud. But I find no authority which gives the party perpetrating the fraud that right, even where resort is had to judicial proceedings. In Robertson v. Cole, 12 Texas, 361, Judge Hemphill, for the Supreme Court, said, "where the husband obtained the license, and subsequently married under the license, by means of perjury and fraud, that the girl could take advantage of that fraud in divorce proceedings, if she acted before the final consummation of the marital relation by sexual intercourse." This is an outpost case, even in ·favor of the innocent party. The case of Johns v. Johns, 44 Texas, 40, was a divorce proceeding in which the plaintiff, as husband, sought to annul the marriage on the ground that his consent was obtained by force and undue influence. He complained that appellee caused him to be arrested on a warrant charging him with having seduced her, and that the sheriff, after making the arrest, took him to the office of the justice of the peace, and appellant, being ignorant of the law, appealed to the officers of the law and the bystanders to know what to do in order to be liberated. The justice of the peace, deputy sheriff, clerk of the district court, and other persons advised him that it would be lawful and to his interest to ·marry prosecutrix, and thereby he would be relieved from the prosecution for seducing her. Upon these grounds he stated in his petition that the marriage was not valid and legal, and that their living together as man and wife was intolerable and insupportable. The trial court refused the divorce, and the Supreme Court affirmed the judgment. Speaking of this, the court said: "The plaintiff appears to have understood that the marriage would cancel the offense with which he was charged and release him from custody. He

knew whether or not he was guilty of the charge against him when he married, and he can not now cancel the marriage, and rid himself of the marriage as he did the prosecution, without showing a better reason for it than he was given in his petition." In that case the marriage was procured by fraud and perjury, and the plaintiff, who was a minor, was married without the consent of her parents. In cases of seduction the party charged with crime has the option to marry the girl and avoid the consequences of the seduction, or stand his trial, with the chances of conviction and punishment. This is not a compulsory marriage; it is optional with the accused whether or not he marries the seduced woman. Even from the standpoint of this statute, a marriage of this kind, under the decision of my brethren, would not be a meeting of the minds of the parties. It would not be a mutual agreement, and therefore not a marriage, if the seducer "fled from the country" after marriage. If it be necessary that the minds of the "parties must meet," in Johns v. Johns, supra, there was not a meeting of the minds of the parties, for there was a mental reservation by the seducer that he would not be bound by the marriage, and sought a divorce. It would have been a case of rape, not a marriage, if my brethren be correct. If marriage be a civil contract, it follows that parties assuming that relation are bound by it despite mental reservations to the contrary by one of them. Tartt v. Negus. (Ala.), 28 So. Rep., 713; 13 Moore, P. C., 242. An accused may marry to avoid the punishment for seduction, with the mental reservation not to fulfill the marital relations. He may marry simply to avoid the consequences of his crime; but this does not affect the good faith of the marriage, nor make the intercourse rape by fraud. It is as binding, nevertheless, as any other character of marriage. If such a marriage has been annulled on the ground of want of mutual consent, it has escaped the observation of the writer. The rule for which I contend is sustained by the authorities. Jackson v. Winne, 7 Wend., 47, 22 Am. Dec., 563; Barnett v. Kimmell, 35 Pa., 13. In Barnett v. Kimmell, 35 Pa., 13, the doctrine was thus laid down: "Consent to a marriage will be presumed from the formal ceremony of marriage, although there was a secret intent on the part of one of the parties not to perform the duties of the marriage relation." And this marriage is complete when the parties have assented to it. Robinson v. Robinson, 188 Ill., 379, 58 N. E. Rep., 906; Elzas v. Elzas, 171 Ill., 632, 49 N. E. Rep., 717; Stevens v. Stevens, 56 N. J. Eq., 488, 38 Atl. Rep., 460; O'Gara v. Eisenlohr, 38 N. Y., 296; Cuneo v. De Cuneo, 59 S. W. Rep., 284, 1 Texas Ct. Rep., 306. Cohabitation is not necessary to the completion of the marriage or to make a marriage contract valid. Franklin v. Franklin, 154 Mass., 515, 28 N. E. Rep., 681; Hulett v. Carey, 66 Minn., 327, 69 N. W. Rep., 31, 34 L. R. A., 384, 61 Am. St. Rep., 419; Jackson v. Winne, 7 Wend., 47, 22 Am. Dec. 563. Nor does an agreement that the marriage is to be kept secret affect the validity of that marriage, though it may cast a suspicion upon the intent of the parties. Sharon v. Sharon, 79 Cal., 633, 22 Pac. Rep., 26, 131; Shorten

v. Judd, 60 Kan., 73, 55 Pac. Rep., 286. If the marital contract is complete, and marriage occurs—they agree to live together as husband and wife—the fact that they agree to keep the marriage secret does not affect the marriage. It is a contract by which the parties are bound, as much so as if it were any other civil contract, whether the world knew it or not, and constitutes a valid marriage. Judge Neill, speaking for the Court of Civil Appeals, in Cuneo v. De Cuneo, 59 S. W. Rep., 284, 1 Texas Ct. Rep., 306, among other things uses this language: "The present consent and agreement between the parties is the gist of the common law marriage. It requires only the agreement of the man and woman to become then and henceforth husband and wife, and the marriage is complete. Simmons v. Simmons (Texas Civ. App.), 39 S. W. Rep., 639. It is not sufficient to agree upon a present cohabitation and a future marriage. 1 Bishop, Mar., Div. and Sep., sec. 262; Cartwright v. McGown, 121 Ill., 388, 12 N. E. Rep., 737, 2 Am. St. Rep., 105. It is required that the cohabitation be as man and wife and in pursuance of the marriage contract. It can of itself be no part of the marriage contract, except it take place after and not before the agreement. Soper v. Halsey, 85 Hun, 464, 33 N. Y. Supp., 105; Farley v. Farley, 94 Ala., 501, 10 So. Rep., 646, 33 Am. St. Rep., 141. 'A consent de praesenti is essential to such a marriage, and a subsequent marriage is established by a proof of a promise and a copula, on the ground that the copula was a consequence and performance of an anterior promise. The copula does not constitute marriage, but it is taken, when circumstances justify it, as evidence of the performance of a previous promise.' Rodg. Dom. Rel., sec. 87; Simmons v. Simmons, supra."

Perhaps it is useless to pursue this line of thought or investigation. Tested by the authorities and all the rules of law and fact applicable to this record so far as I am apprised, if the testimony of prosecutrix is true or believed by the jury, the marriage is valid. Certainly appellant can not say nay. He will not be permitted to deny that his mind met that of prosecutrix. Why? Because it was at his instigation she came to Dallas, and it was at his urgent request and solicitation she married him, and for his gratification she submitted her body to his desires. So, we have by the testimony an actual marriage, followed almost immediately by cohabitation, and continuing to within about a month of the birth of their child. There is nothing wanting under her testimony to make a complete marriage, and if appellant had died before the second marriage there would have been no question of the right of prosecutrix and the child to inherit whatever of his property the law would set apart to his widow and child. It is not asserted the second marriage annulled the first. This could not be the law, if asserted.

Suppose appellant had been charged with seduction of the prosecutrix, instead of rape, and she had testified the marriage occurred under the circumstances detailed and subsequent to the seduction, would it be

contended for a moment that any court in this State would permit a conviction for seduction? Certainly not. Or suppose appellant had been tried for bigamy for the second marriage, with this testimony before the jury would it not have become the bounden duty of the trial court to charge the jury, if they believed the facts stated, appellant would be guilty of that crime in contracting the second marriage? Most assuredly. I desire to say, in concluding this branch of the case, that prosecutrix's testimony as to the marriage is denied by appellant in toto. He says the ceremony never occurred; so there is a square issue as to whether or not the marriage took place. But if the jury believed it occurred then the girl is not contradicted. In fact, by appellant's letters, by his confessions, by his acts, by his holding her out at the hotel and thus to the world as his wife, by his admissions and statements, and by all his conduct, the testimony of the girl is corroborated, it occurs to me, in the fullest manner. His admissions alone are proof of his marriage. Miles v. United States, 103 U. S., 304, 26 L. Ed., 481; State v. Hughes, 35 Kan., 626, 12 Pac. Rep., 28, 57 Am. Rep., 195; State v. Hilton, 3 Rich. Law, 434, 45 Am. Dec., 783; Cameron v. State, 14 Ala., 546, 48 Am. Dec., 111; Wolverton v. State, 16 Ohio, 173, 47 Am. Dec., 373; Forney v. Hallacher, 8 Serg. & R., 159, 11 Am. Dec., 590; Jackson v. People, 2 Scam., 23.

In regard to the other branch of the case, in which the court charged the jury to find appellant guilty of "rape by fraud," it occurs to me this is so utterly at variance with the law that the mere statement of the proposition brings its own refutation. If the majority be correct, then a man, after inducing a girl to enter the marital relation with him, may desert and leave her a wreck on society, his children bastards, and this desertion form the basis of "rape by fraud." In order to sustain this ruling of the trial court, every decision in Texas on the question must be ignored. Quoting from the opinion of the majority: "Appellant furthermore insists that the court erred in not instructing the jury to acquit because there was no evidence of rape by force or threats, and that the State's case hinged upon the theory of a fraudulent impersonation by defendant as the husband of Rosa Parrish, and, if not married, the facts disclose no offense, for that since a rape by such means is under the statute applicable alone to the protection of married women. In support of this proposition appellant cites King v. State, 22 Texas Crim. App., 652; Franklin v. State, 34 Texas Crim. Rep., 203; Milton v. State, 23 Texas Crim. App., 204; Milton v. State, 24 Texas Crim. App., 286; Mooney v. State, 29 Texas Crim. App., 258; Payne v. State, 38 Texas Crim. Rep., 494. These cases appear to support appellant's contention; but an inspection of the statement of facts in each instance shows that these were prosecutions for rape by fraud upon a woman theretofore married—that is, a woman married to a person other than appellant—and the decisions merely hold in that character of prosecution that the indictment should show the woman was

a married woman." This excerpt overrules another line of decisions, many of which are expressly mentioned.

In regard to the fraud which must be used where the woman is married, this language is found in article 636, Penal Code, 1895: "The fraud must consist in the use of some stratagem by which the woman is induced to believe the offender is her husband." The majority further say: "From these authorities this court would not be authorized in holding that the woman upon whom fraud is practiced, in order to secure her consent to an act of copulation, must be a married woman in every instance. This would be a strained construction—in fact, would not be a construction at all, but an interpolation upon the statute." I might perhaps rest upon the statement of the majority that all of the decisions in Texas heretofore rendered are in direct conflict with their opinion, for all former decisions expressly hold that the article just quoted refers only to married women; that is, to a woman married to some person other than the party accused of the rape. The article under discussion has been enacted and re-enacted by legislative bodies, and again and again given the same construction. And in Payne's case, supra, the court went so far as to hold "that an indictment which charges a rape by fraud in personating the husband, in order to be sufficient, must allege that the injured female is a married woman, and not the wife of defendant."

But there are two or three suggestions I desire to make in regard to this matter. It will be noticed that in our Penal Code each class of offenses is treated as a harmonious whole in regard to the subject about which the legislation occurred. In regard to illlicit intercourse, for instance, we find statutes prohibiting fornication, adultery, abduction for the purpose of marriage, etc., rape, assault to rape, attempt to rape, rape by force, rape by threats, rape by fraud, rape upon imbecile women, rape upon girls under 15 years of age with or without force, with or without consent, and statutes against incest, bigamy and seduction. Each of these crimes has within itself constituent elements, differing it from each of the others. They have been carved out by the Legislature, and were intended to be separate from and not to trench one upon the other; that each is an independent offense, made up of the elements set out in its definition, and each peculiar to itself, by the legislative act. The opinion in this case is an entering wedge into this division or subject of our Penal Code, the harmony heretofore existing is broken, confusion the result, and what has heretofore been bigamy may become rape by fraud; what has been a valid marriage to avoid the consequences of seduction is or may be a rape by fraud; and so it may be of incest, if the marriage is followed by sexual intercourse. It strikes at the fundamental constituent elements of these different offenses, and blends them all into one general "hotchpotch," denominated "rape by fraud." This construction saps the very foundation of the marital relation, and wipes out all statutory distinctions between these crimes and that of "rape by fraud." I can not agree that the prior decisions are "interpolations

on the statute." The opinion in this case is the "interpolation." The legislative mind intended what the courts have heretofore held, and what a casual inspection of those statutes demonstrates; and from these there has been no dissent, either from bench or bar, until the decision in this case. Decisions heretofore rendered have been recognized as correct; that is, that a rape by fraud upon married women must be by a party other than the husband or alleged husband of the ravished woman. Applying the doctrine now laid down by this case to the crime of bigamy, it will be found that whenever the accused enters into a bigamous marriage, and that marriage is consummated by sexual intercourse, it necessarily is rape by fraud. Why? Because such marriage is a fraud on the part of the bigamous husband. The accused in such case can not enter into a second marriage; it is void by law, by reason of the previous existing marriage; therefore it must be fraudulent. There would be no question that the accused in a bigamous marriage would thereby induce the woman, however innocent she may be, to believe that he is her husband. That point being reached, their decision is or may be authority for the conviction for a "rape by fraud." I had heretofore thought this was one of the distinguishing characteristics between bigamy and rape. So, in seduction, if the accused, in order to avoid conviction for seduction, marries the woman, without intending to live with her; that his mind did not meet with hers; that he had a secret mental reservation to discard the marital relation; that he was not performing the marriage in good faith—he would thereby be perpetrating a fraud upon the woman in order to keep out of the penitentiary for the seduction, and therefore guilty of rape by fraud, and his marriage consummated to avoid the consequences of the seduction would be incontestible proof of the more heinous crime of "rape by fraud," for which his life could be forfeited, despite the holding of the Supreme Court that it does not constitute ground for divorce. So of incestuous marriage, if the act of sexual intercourse occurs it makes rape by fraud more than a possibility, and so of most of the prohibited acts of illicit intercourse. The court finds the facts true, but the acts and purpose of one party fraudulent; hence the presumption in favor of marriage and presumption of innocence and reasonable doubt are unitedly turned against the accused. These presumptions should have been indulged favorably to appellant, and not to force conviction. This case may be the progenitor of another line of decisions at variance with all prior decisions, and contrary to all statutory provisions on the subject, the result of which is not readily contemplated or easily foreseen.

For the reasons indicated, I can not concur with my brethren. The opinion is wrong in principle, and will be vicious in its application. Therefore I enter this my solemn protest, and respectfully dissent.

March 31, 1903.