## Simon L. Elzas v. Ada Elzas.

1. Construction—*Intention Should be Discovered and Enforced.*— It is the duty of the court in construing a contract to discover and give effect to the intention of the parties where it is practicable to do so, so that performance of the contract may be enforced according to the sense in which it was mutually understood at the time it was made, and greater regard should be paid to the clear intent when ascertained than to any particular words which may have been used in the expression of that intent.

2. Marriage—*An Alleged Common Law Marriage Sustained.*—The court reviews the evidence and holds that it sustains the finding of the trial court that appellant and appellee had made a contract of marriage valid under the common law.

Divorce.—Appeal from the Circuit Court of Cook County; the Hon. Elbridge Hanecy, Judge, presiding. Heard in this court at the March term, 1897. Affirmed. Opinion filed October 11, 1897.

B. M. Shaffner, attorney for appellant.

Joseph Wright, attorney for appellee.

Mr. Presiding Justice Adams delivered the opinion of the Court.

This is an appeal from a decree of divorce rendered in favor of appellee and against appellant. The bill alleges

that the parties were lawfully married in the city of Chicago in this State in September, 1885, and thereafter lived and cohabited as husband and wife until March, 1891, when appellant willfully, and without reasonable cause, deserted and absented himself from appellee, and has since persisted in such desertion.

The bill also avers that a child, Allen L. Elzas, aged ten years, was born, the issue of said marriage, etc. Appellant answered the bill, denying specifically the allegations of marriage and the birth of a child by him, and generally all the allegations of the bill. The case, by agreement of the parties was heard by the court, without a jury, upon the bill, answer, replication and the testimony of witnesses in open court, and the court rendered a decree in accordance with the prayer of the bill.

The chief and almost solely contested question between the parties, is whether they were lawfully married, as alleged in the bill. It is not claimed by appellee that there was a marriage solemnized as prescribed by the statute, but she claims that there was a marriage valid at common law. The evidence on the question is substantially as follows:

The appellee says that prior to September, 1885, she had been living in what is described in the evidence as a "sporting house," and that appellant, who was a sporting man, gambler and book-maker on the races, had been acquainted with her more than a year, and had visited her every day for about nine months prior to the alleged marriage. Appellee testified as follows: "Well, we had known each other a little over a year at the time, in 1885, and he came generally to see me, and said he thought a great deal of me, and he had spoken of taking me away from the house where I was living, and having me lead a different life; and he asked me if I thought enough of him to be his wife, and I told him yes, I did, and he asked me if I would consider it, think it over, and to let him know, if I made up my mind definitely what to do; so, previous to the month of September, for a month, I had seen him almost continually every

day; in fact, every day I had seen him, and he came to me at that time and told me, he said, ' Ada, I think you think a great deal of me; I do of you, and will you take me as your husband; I want you to settle it; you said you would consider it.' I said, ' Yes, I think enough of you, Sam, to live with you and to be your wife,' and he said, 'Well, from this time'—he said—'I want your consent, and will you accept me as your husband, and, if so, I will take you as my wife,' and I said, 'Yes I will.' I said, 'Who will we get to marry us?' I said, 'I was always brought up an Episcopalian and that church calls for a ceremony.' He said 'There is no ceremony necessary. I am a Jew and you are a Gentile; it would not be more legal if a ceremony was performed; it is only a contract; I agree to take you as my wife,' he said, 'and then we will be husband and wife,' and he then gave me the ring I have. I then consented to be his wife."

Appellee was eighteen years of age at this time. She further testified that appellant, at the close of the conversation above related, which she says occurred September 15, 1885, told her to leave the house where she was then stopping, saying, "Pack up your trunk and get out at once," which she did, and with his consent took rooms in a house on Wabash avenue, where she and appellant lived until April 27, 1886, when she went to her father's residence at Toronto, Canada, to be confined, and remained there until September 18, 1886, when she returned and lived with appellant as his wife, at different places in the city of Chicago, until the time of the alleged desertion.

It does not appear from the evidence that, after the alleged marriage the parties lived in any except respectable places.

July 18, 1886, while appellee was in Toronto, she gave birth to a boy, who was named Allen L. Elzas, which child, she says, was conceived after she removed to Wabash avenue, and after the alleged agreement of marriage, which is consistent with the dates of the alleged marriage and the birth of the child.

Appellee's account of the interview between her and appellant in relation to marriage is corroborated by other witnesses, and by facts and circumstances proven in the case.

Minnie Bailey, appellee's sister, thus testified: "One evening we were sitting in the parlor, and he spoke of having a circumcision performed on the child, as he was a Jew, and my sister objected, and he said, 'That is my wish, I want it done.' My sister said, ' Sam, you want your way in everything,' and she was quite indignant. She said, ' When we were married, we were married without a ceremony,. and I don't believe in having him circumcised.' He said to me, ' Minnie, when we were married, we were married without a ceremony.' I said, 'As an Episcopalian, we believe in ceremony.' He said, ' I am a Jew and your sister is a Gentile, and it is not necessary; she is my legal wife as much as though we were married by a rabbi; she had a ring from me.' " The witness also testified that appellee had a ring when she arrived in Toronto.

Dr. E. M. Eiss testified that in the summer of 1890 he, by appellee's request, attended appellant, who was then suffering from an attack of cholera morbus, and that when he, witness, asked appellant for his fee, appellant told him to wait, that his wife would pay it, which appellee subsequently did; that he saw appellant again in March, 1892, at the house where he and appellee were then living, and spoke to him about his, the witness's, bill for medical attendance on the boy, whom he had previously attended, when appellant said the bill would be all right; that his wife would pay it. More than forty letters from appellant to appellee were produced and put in evidence by appellee, the envelopes of most of which, appellee testified, were destroyed, but the address on eleven of them is " Mrs. Ada Elzas," etc. Also a letter was put in evidence from one Joseph F. Ulman, which reads " Mrs. Simon L. Elzas." "At request of Sam I send you $50." Some of the letters from appellant to appellee were written from Chicago while she was in Canada, and others at times when appellant was absent from Chicago, ostensibly on business. In a large number of the letters he mentions

the boy in the most affectionate terms, and expresses great solicitude for his health and training, and unequivocally admits his paternity. One letter, inclosed in an envelope postmarked New York, January 22, 1891, addressed "Mrs. Ada Elzas," is as follows:

"Dear Allie: Received your letter; there is not your equal here when you are a good boy."

"PAPA."

Indorsed, "Allie Elzas, personal."

In a letter written to appellee while she was in Canada, of date July 21, 1886, three days after the birth of the child, he writes, among other things: "Every one I have told is pleased about the little boy. That little boy shall never want while I have a dollar, and, between us, we can bring him up in good style." Appellant's conduct toward appellee and her child, as evidenced by these letters, was that of an affectionate husband and father, solicitous for the welfare of his wife and child. Appellee testified that appellant introduced her as his wife to his father, to Joseph Ulman and wife, and to different persons, at the house on Wabash avenue, to which they removed after the alleged marriage. The appellant was the only witness for himself, and denied all the material testimony introduced by appellee. His evidence is wholly uncorroborated.

Appellant's counsel, in his argument, contends, first, that the words used in the interview testified to by appellee were *verba de futuro;* in other words, that they related to the future, and did not, of themselves, constitute a marriage; and secondly, that the cohabitation which succeeded the conversation in relation to marriage, must be presumed to have been a mere continuance of the prior illicit intercourse, and without reference to the prior agreement of the parties, or in consequence of it. If the first proposition is unsound, viz., that the words used were used in reference to a future time, then the entire superstructure of the argument, based on that premise, falls to the ground. Bishop says: "An executory contract of marriage is a mutual promise of the parties to intermarry in the future; one executed, is their agreement in due form, to be thenceforward husband

and wife." Bishop on Marriage and Divorce, Sec. 10, Ed. 1891.

The same author says: " Or it is sufficient that the parties, in language mutually understood, or in any way declaratory of intention, accept each other as husband and wife. Even, says Swinburne, if the words do not of their natural meaning 'conclude matrimony,' yet, if the parties intend it and this appears, 'they are inseparable man and wife, not only before God, but also before man.'" Ib., Sec. 320. The text last quoted is cited with approval in Dickerson v. Brown, 49 Miss. 357.

It is a familiar and fundamental rule of construction, that "it is the duty of the court, when it is practicable to do so, to discover and give effect to the intention of the parties, so that performance of the contract or other instrument may be enforced according to the sense in which it was mutually understood at the time it was made, and *greater regard is had to the clear intent, when ascertained, than to any particular words which may have been used in the expression of that intent.*" Field v. Leiter, 118 Ill. 17, 26.

This rule of construction is referred to because appellant's counsel apparently relies on the fact that some of the verbs in the interview between the parties are in the future tense. But: *Qui haeret in litera haeret in cortice.* Now what was the intention and what the mutual understanding of the parties in the present case, at the time of the interview testified to by appellee? In the first place, the appellant had proposed marriage to the appellee, and requested her to consider the proposal, which it seems she did for about a month's time, at the end of which time, he came to her and asked her if she would accept him as her husband, saying that she had promised to consider it, and that he wanted it settled; she said yes, but thinking that some ceremony was necessary, said, " Who will we get to marry us?" To which he answered that no ceremony was necessary, etc., adding " I agree to take you as my wife, and then we will be husband and wife," and he then gave her a ring, and she says she consented. That appellant intended that appellee should

understand that what had transpired between him and her at that interview constituted marriage between them, is too clear to require argument. She must have so understood appellant, and could not, after that interview, have reasonably expected any future ceremony.

The conduct of the parties immediately after the interview, in removing into another and apparently respectable house, thus effecting a complete change in appellee's mode of life, the introduction by appellant of appellee to others as his wife, his speaking of her and addressing letters to her as such, are all evidence tending to prove that it was their mutual understanding that they were lawfully married.

It is a most pregnant circumstance that, after the birth of the child, he informed his friends of it, as shown by his letter of July 21, 1896. He says: "Every one I have told is pleased about the little boy." He had, apparently, been circulating the, to him, joyful news. It is not in accordance with common experience that the father of an illegitimate child who is, in law, *nullius filius*, is so prompt to publish the paternity of the child, or to manifest pride in the circumstance. But even though it should be conceded that appellee can only claim a marriage *per verba de futuro cum copula*, yet, we are of opinion that the evidence shows a change in the minds of the parties, their mode of life, and their relation each to the other, sufficient to rebut the presumption that their intercourse, subsequent to the date of the alleged marriage, was a mere continuance of the prior illicit intercourse. Bishop, commenting on this presumption, says: "Slight circumstances may show (the slightest ought, within a rule considered in the last chapter, to be pressed into this service) a change in the minds of the parties respecting their connection, resulting in the presumption of marriage, though the intercourse was willfully illicit at first." 1 Bishop on Marriage and Divorce, Sec. 965, Ed. 1891.

The same author disputes the proposition apparently assumed in some of the cases, that marriage can not be pre-

sumed from cohabitation and repute when the cohabitation was illicitly begun. Ib., Sec. 977.

Desertion, as alleged in the bill, was abundantly proved. We are of opinion that the allowance of alimony is warranted by the evidence, and is reasonable.

Decree affirmed.