## Simon L. Elzas

*v.*

## Ada Elzas.

*Opinion filed February 14, 1898.*

1. Marriage—*marriage may be valid without solemnization by ceremony.* A present contract between parties to accept each other as man and wife, and to enter into the marriage relation, is valid and binding when acted upon, though the marriage is not solemnized according to the statute.

2. Same—*whether the marriage relation exists is always a matter of evidence.* Whether the marriage relation exists is always a matter of evidence, and may be proved by records or any other evidence sufficient to establish the fact; and if it be shown that the parties intending marriage have accepted each other as husband and wife the contract will be enforced.

3. Same—*when presumption of continuance of relation meretricious in its inception is overcome.* The presumption of the continuance of a

relation meretricious in its inception is overcome by evidence that after the agreement to live together as man and wife, the woman then being an inmate of a house of ill-repute, the parties immediately moved into a respectable location and lived together openly as man and wife.

4. SAME—*what evidence will establish a common law marriage.* Evidence that parties agreed to accept each other as man and wife; that the woman thereupon abandoned her dissolute life and immediately moved with her accepted husband into a respectable locality, where they lived together openly as man and wife; that the man introduced and spoke of the woman as his wife and directed his letters to her as such, will establish a common law marriage, as against the uncorroborated denial of the husband.

5. DIVORCE—*desertion—effect of husband's contributing to wife's support during his absence.* One who absents himself from his wife and abandons all matrimonial relations with her, intending such abandonment to be permanent, is guilty of desertion, notwithstanding he contributes to her support during his absence, as by so doing he merely discharges a legal duty, the neglect of which, since 1893, has constituted a misdemeanor.

6. ALIMONY—*allowance of $1000 a year as alimony sustained.* An allowance of $1000 a year as alimony for the support of the divorced wife and her child is not excessive, where the husband's net income, after paying his personal expenses, is $2500 per year.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

B. M. SHAFFNER, for appellant.

JOSEPH WRIGHT, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellee filed her bill in the circuit court of Cook county against appellant for a divorce, on the ground of desertion. Appellant answered the bill denying its allegations, and especially denying that he was ever legally or lawfully married to appellee. There was a hearing of the issues before the court, and they were found for

appellee, and a decree was entered divorcing the parties and awarding the custody of their child, Allen L. Elzas, to appellee. From that decree an appeal was taken to the Appellate Court for the First District, where it was affirmed.

The main dispute at the hearing was, and now is, over the question whether the parties ever entered into a legal contract of marriage. There was no ceremony or public solemnization of the contract between them, but complainant's claim was, that on September 15, 1885, they entered into a valid contract of marriage. When parties come together and agree by a present contract to accept each other as husband and wife and enter into the marriage relation, such a contract will be valid and lawful, although not solemnized according to the provisions of the statute. The relation between the parties is always a matter of evidence, and may be proved by records or any other evidence sufficient to establish the fact; and if it is shown that parties intending marriage have accepted each other as husband and wife, the contract will be enforced. *Port* v. *Port*, 70 Ill. 484; *Hebblethwaite* v. *Hepworth*, 98 id. 126.

Defendant was a gambler and lived in Chicago, and also followed running races in various places. At the time of the marriage complainant was eighteen years of age, and was, and for some time had been, an inmate of a house of ill-repute in that city. The direct proof of the marriage consisted of her testimony to the fact, and the testimony of her sister to defendant's statements and admissions. Complainant testified that she and defendant had known each other a little over a year at the time of the marriage; that he had professed great regard for her, and had spoken of taking her away from the house where she was and having her lead a different life; that he had asked her if she thought enough of him to be his wife, and she told him that she did; that he had asked her to consider and think it over, and let him know if she made

up her mind definitely what to do, and that she had seen him daily for a month previous to the time when he came to her and the agreement was made. What occurred at that time she narrated as follows: "He said, 'Ada, I think you think a great deal of me. I do of you, and will you take me as your husband? I want you to settle it. You said you would consider it.' I said, 'Yes, I think enough of you, Sam, to live with you and be your wife,' and he said, 'Well, from this time I want your consent, and will you accept me as your husband? and if so, I will take you as my wife.' And I said, 'Yes, I will.' I said, 'Who will we get to marry us? I was always brought up an Episcopalian, and that church calls for a ceremony.' He said, 'There is no ceremony necessary. I am a Jew and you are a Gentile. It would not be more legal if a ceremony was performed. It is only a contract. I agree to take you as my wife, and then we will be husband and wife,' and he then gave me the ring I have. I then consented to be his wife." She testified that he then told her to leave that house at once. She asked where they should go, and he told her to pack up her trunk and get out at once; that she said, "Very well," and immediately gathered up her things, and that they took rooms in a house on Wabash avenue, where they lived until April 27, 1886, when she went to her father's residence at Toronto, Canada, to remain for a time. This visit to Canada was by mutual agreement of the parties, and while there the boy, Allen L. Elzas, was born July 18, 1886.

The statement and admission of defendant as to the marriage contract were testified to by Minnie Bailey, complainant's sister, as follows: "One evening we were sitting in the parlor and he spoke of having a circumcision performed on the child, as he was a Jew, and my sister objected, and he said: 'That is my wish. I want it done.' My sister said: 'Sam, you want your way in everything,' and she was quite indignant, and she said, 'When we were married we were married without a ceremony,

and I do not believe in having him circumcized,' and he said to me, 'Minnie, when we were married we were married without a ceremony.' I said, 'As an Episcopalian, we believe in ceremony.' He said: 'I am a Jew and your sister is a Gentile, and it is not necessary. She is my legal wife as much as though we were married by a rabbi. She had a ring from me.'" This ring was worn by the complainant after the marriage.

From the time of the removal to Wabash avenue, when the parties began living together, they resided in that place and Hyde Park, and other localities in Chicago, openly as husband and wife until his desertion of her, in March, 1891. There was disinterested evidence that they were so regarded, and that she introduced him as her husband and that he spoke of her as his wife, and she testified that he introduced her as such. His physician testified that when he attended him at a sickness in 1890 and asked for his fee, defendant asked him to wait a few moments and his wife would be in and pay him. He thereupon waited and the complainant came in and gave him the money. He said that on another occasion when he was in attendance as a physician, defendant said to him: "That will be all right. My wife will pay you. I am a traveling man and am not here regularly." She testified that among others to whom he introduced her was his employer, Joseph F. Ullman. Afterward Ullman wrote her a letter, which was in evidence, addressing her as "Mrs. Simon L. Elzas," and enclosing money at the request of defendant. This letter shows very satisfactorily that he represented to Ullman that complainant was his wife. It is clear that the relationship assumed before the public was that of husband and wife, and every presumption of the law would be that the relationship existed. The law does not presume in favor of vice and immorality, but in favor of a lawful relation. 1 Bishop on Marriage and Divorce, sec. 434.

The only evidence on the part of the defendant was his own testimony, which consisted of a general denial that he ever promised complainant to be her husband or asked her to be his wife, or lived with her as such. His testimony was not only discredited by what has been said of his conduct and representations and the apparent relation assumed, but in a much greater degree by his own letters. While complainant was at Toronto he wrote her many letters, and after the birth of the boy rejoiced in that event, saying, among other things: "Every one I have told about the little boy is very much pleased, and all send their best wishes for your speedy recovery, and they all please me when they wish long life to *our* little boy. I think between us that we can bring him up in as good a style as any papa or mamma in the land." In his letters he gives the names of a number of his friends who send their regards. These are not the letters of a man who is telling his friends and receiving their congratulations upon the birth of an illegitimate child in such relation as he now claims. They are letters characteristic of a husband and father rejoicing upon the event and solicitous for the health and welfare of his wife and child. There were many other letters written by him after she returned to Chicago, in September, 1886, and in all more than forty such letters were introduced in evidence. In pursuing his business as gambler and book-maker he was away from home a considerable portion of the time in different places where races were in progress, and these letters were written from such places. The envelopes of eleven of them had also been preserved, and they were directed to "Mrs. Simon L. Elzas." In them he addressed her as "Dear Ada," and admitted that in one of them he addressed her as wife. We think that the court was justified in giving but little credence to his statements.

The only thing, beside his naked denial, which could tend to defendant's advantage in any way, is the fact

that complainant, in a suit before a justice of the peace, while testifying to her marriage to defendant, said that there was a ceremony on Wabash avenue, but she did not know by whom or whether it was by a minister or not, but it was a customary ritual through which they go under such circumstances. Her only explanation was that the examination before the justice was an unpleasant one, and she became confused and could not remember what she said. But whatever was said there, we think, in the light of all the evidence, the marriage contract was established in this case. She never admitted at any time that they were not married, but refused an allowance of $75 per month offered her on condition that she would make such an admission. Her testimony on this hearing was corroborated, and the evidence was sufficient to establish the relation claimed. It is true that the relation between the parties was in its inception meretricious, and not matrimonial, and that a relation so commenced will be presumed to continue of the same character in the absence of proof of a change in its nature; but the parties might assume legitimate and proper relations, and should be commended for doing so, and it is, of course, admissible to show that such a change took place. In this case there was an immediate change when the contract was made. She packed up her things and they moved to a respectable place, and afterward lived in decent and respectable places. He deserted her without cause in March, 1891. She and her sister testified that at the time of the desertion he had been in New York, and on his return she upbraided him for relations with disreputable women and neglect of her, and that the only reason he gave for leaving her was that he was tired and was going to quit. There is not a word of evidence that she did not keep faith with him or fulfill to the utmost her wifely duties.

It is insisted, however, that there was no desertion, because, after leaving her and removing his effects, he

continued to contribute to the support of her and their child. His abandonment of her was intentional and designed to be permanent, depriving her of his society and his protection and companionship. He willfully denied to her every right of a wife except the allowance in aid of her support and that of his child, and permanently absented himself and abandoned all matrimonial relation with her. Desertion and absence are treated as synonymous in our decisions. (*Carter* v. *Carter*, 62 Ill. 439; *Fritz* v. *Fritz*, 138 id. 436.) To forsake and abandon complainant and absent himself from her was desertion, and it was not the less so because he made some allowance for her. (*Magrath* v. *Magrath*, 103 Mass. 577.) The payment of the allowance only discharged a legal responsibility resting upon him, the neglect of which has, since 1893, constituted a misdemeanor, for which he might be prosecuted and punished.

It is insisted that the court erred in allowing a solicitor's fee of $100 upon the appeal to the Appellate Court. The allowance was authorized by the statute, and we see no objection to it.

Defendant, at the time of the hearing, was in the employ of a New York wine house as traveling agent, at a salary, as he testified, of $4000 and his traveling expenses. His personal expenses were about $1500 a year, and his net income, after paying all his own expenses, was $2500. The allowance of alimony was $1000 a year. He testified that he made voluntary contributions to aid some relatives, but, with the net income stated, the allowance for the support of his wife and boy eleven years old was not excessive.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*