## EVIDENCE ESTABLISHING A COMMON LAW MARRIAGE.

Circuit Court of Stark County.

LEE UMBENHOUR v. HAZEL UMBENHOUR ET AL.

Decided, September, 1909.

*Husband and Wife—Marriage per Verba de Praesenti, Valid, When— Agreement not Made in the Presence of Witnesses—Competency of Testimony of the Parties thereto—Death of One does not Preclude Receiving Testimony of the Other—Question of the Validity of the Marriage One of Fact for Jury or Court, When—Sections 5240, 5241 and 5242.*

1. A mutual agreement entered into in good faith between competent parties to contract the relation of husband and wife, followed by cohabitation as such, constitutes a valid marriage, even if the agreement was not made in the presence of witnesses.

2. When it appears that the relation between the parties was in its inception meretricious and not accompanied by any evidence of marriage, but subsequently their relations to each other assume a matrimonial character by being surrounded by evidence of a valid marriage, a question of fact is presented for the determination of the jury or court trying the issue of marriage or no marriage between the parties.

3. In such case either party is a competent witness to prove the agreement. After the matrimonial *status* is fixed by cohabitation, the parties thereafter come under the rule of exclusion as is provided in Subdivision 3 of Section 5241, Revised Statutes.

4. In this case, notwithstanding the husband is dead, not being a party the wife is not rendered incompetent as a witness by Section 5242, Revised Statutes.

*McCaughey, Lynch & Day,* for plaintiff.
*Shields & Pomerene,* contra.

VOORHEES, J.; DONAHUE, J., concurs in a separate opinion; TAGGART, J., dissents.

This cause of action comes into this court on appeal, and is submitted to the court on the pleadings and evidence.

The main dispute or contention is over the question whether one Willard P. Umbenhour and Margaret Labus, otherwise known as Margaret Umbenhour, ever entered into a legal contract of

marriage. There was no·ceremony or public solemnization of the contract between them, or marriage according to the statutes of Ohio regulating marriages; but it is contended by the defendant, John J. Weffler, as guardian of Grace Helen Umbenhour, a minor, that on or about the 12th day of May, 1901, at the city of Massillon, in Stark county and in the state of Ohio, the said Willard P. Umbenhour and said Margaret Labus entered into a contract of marriage, and thereafter cohabited together as man and wife, until the death of said Willard P. Umbenhour, which occurred on or about the 14th day of February, 1907. He died intestate, leaving as the only issue of his body the plaintiff, Lee Umbenhour, the defendant, Hazel Umbenhour, and the said Grace Helen Umbenhour. Said Margaret is not a·party to this action.

At the the time of making said alleged contract of marriage said Willard P. Umbenhour was a single man, and said Margaret Labus was a single woman, both being of marriageable age, and no legal impediment existing to prevent their entering into a valid contract of marriage. The said Willard P. Umbenhour had been previously married, but prior to said 12th day of May, 1901, an absolute decree of divorce had been granted to his former wife. The direct proof of the making of the contract of marriage consisted of the testimony of Margaret Labus of the fact. She admitted in her testimony that she and Willard P. Umbenhour had sustained meretricious or illicit relations with each other prior to the 12th day of May, 1901. They lived in the city of Massillon. He was a bartender at the Hotel Conrad; she was laundress at said hotel. There is no evidence, nor is it even claimed that they there cohabited together, prior to May 12, 1901; he had a room in a tenement house on Park Row in said city. The evidence does not disclose whether she roomed at the hotel, or had a room in said tenement house on Park Row. It was not shown or admitted by her that they had cohabited together prior to May 12, 1901, the admission only going to the extent that prior to the date named they had illicit relations with each other. On the day named, she was at the room in said tenement house on Park Row where said Willard P. Umbenhour roomed, at which time and place she testified the

agreement was made. As to what occurred at that time she testifies in chief, as follows: that "Billy (meaning said Willard P. Umbenhour) said to me, 'The court won't give us no license,' and he took my hand and he said, 'I pledge myself as a true and lawful husband to you the longest day I live'; and I said ·to Billy, 'I pledge myself as a true and lawful wife to you the longest day I live'; he slipped his mother's wedding ring on my finger, and he kissed me, ·and ·he said, 'If we ever have any children they will hold us together.' '" And on cross-examination she testifies as follows: "Willard said to me 'The court wouldn't give no license,' and he took my hand and he said, 'I pledge myself as a true and lawful husband to you the longest day I live'; and I said to him, 'I plede myself as a true and lawful wife to you the longest day I live'; then he kissed·me and slipped a ring on my finger.

From this time, to-wit, May 12, 1901, until the death of said Willard P. Umbenhour, they cohabited as husband and wife—so treated each other, and. held themselves out as such to the community. They established themselves in a home in said tenement house in Park Row in the city of Massillon, where they lived for·a time, and were recognized as husband and wife by those who had occasion to come in contact with them. True, for about two weeks she continued to work at the hotel as laundress, until they could fill her place. At.the time the alleged agreement was made Willard P. Umbenhour was working at Sim Weffler's, a brother of Squire Weffler, the guardian of said Grace Helen Umbenhour, and defendant in this·suit. They prepared their meals in said room and established themselves in it as a home. After living in Massillon for about a year, they moved to the city of Alliance in said county of Stark, and took up their residence there, living in Mrs. Rastetter's house for a while, and later moved upon another street. They kept house in said last named city in the usual way that married people do. True, their acquaintance in this latter city was limited, they were strangers there, but so far as people became acquainted with them, they were recognized as man and wife, and were introduced as such to callers and neighbors who had occasion to meet them. Before moving to Alliance, Willard's uncle died,

and he attended the funeral, taking with him said Margaret, and there introduced her to his relatives as his wife. While living in Alliance a child was born, which child had been conceived after the making of said agreement or contract. The husband— or we will still designate him by his name of Willard P. Umbenhour—secured the services of a physician to attend his wife in confinement. He said to the doctor, he "wished to engage his services to attend his wife in confinement." The doctor did so, was introduced by Willard to this woman as "his wife," the child was born on the 3d day of October, 1902, and is still living, and through its guardian, the defendant, John J. Weffler, is contending for its rights as a child and heir of the body of Willard P. Umbenhour. Willard put its name, giving the name as Grace Helen, in the Bible belonging to them, among the names of other children and members of his family. When speaking to or concerning this child, he always referred to it as his, and when referring to this woman, either as his wife, or "mama" when desiring the child to go to her. Other facts, circumstances, and acts in recognition of their relation to each other as that of husband and wife might be mentioned, but this is the trend of the testimony bearing on the question of the agreement and of their cohabitation. These circumstances and facts tend to corroborate the wife in her claim that the contract of marriage was made before these acts and relations were done and assumed.

It is true that the relation between these parties was at one time, in its inception, and prior to May 12, 1901, meretricious and not matrimonial. We concede that a relation so commenced will be presumed to continue of the same character in the absence of proof of a change in its nature; but the parties might assume legitimate and proper relations, and it is admissable to show that such change took place, if it did.

In this case there was a change after the contract was made as we have shown. The only thing to militate against the validity of this marriage, as a common law marriage, is the claim that Willard P. Umbenhour at one time and after the making of the alleged contract said he was married over at Wooster, Wayne county, this state, by a minister. He did not deny or

say he had not married this woman, but gave a false statement as to where and how he was married. On another occasion, referring to this child, Grace, he expressed a hope or desire that she should share in his property as his child, and on one occasion, and shortly before his death, or last sickness, in speaking about a *ceremonial marriage,* he said that "we ought to get married" or "we ought to get married now."

It is further contended that she, Margaret, gave a false statement concerning the marriage, stating that she was married on some big water. This statement like his, as to where they were married, or that they ought now to have a ceremonial marriage, did not deny the making of the agreement, or that there was a marriage relation existing between them, but the statements were untrue as to the place and manner of their marriage.

These statements we think can have no other effect or force than as they tend to discredit her contention that a contract of marriage had been made between them at the time, place and manner now claimed by her on this trial.

Whatever was said by Willard, or by her, as to when and where they were married inconsistent with the present claim, we think, in the light of all the circumstances and conduct of these parties as disclosed in the evidence, from and after the date of the making of the contract, could not and do not destroy the effect of such a contract so made, followed by cohabitation, to establish a legal marriage between these parties.

It is necessary to consider some questions urged at the trial as to the competency of this woman as a witness in this case. It is contended by plaintiff that she is an incompetent witness to testify to the making of the contract. The objection is not laid upon any special ground, but of general incompetency.

Under Section 5240, Revised Statutes, she is a competent witness unless some ground of exclusion is shown. She is not excluded by Section 5241, unless it would be under the third subdivision of this act. If she is or ever was the wife of Willard P. Umbenhour, her competency as a witness would be limited by this section. If this contention is sound, would it not be the end of this case? We think the contention that she

is not a competent witness to prove the making of the agreement
is not tenable.

Marriage, strictly speaking, is not a mere civil contract, but is
a *status* created by contract. It is true it is founded on consent of
the parties, but the consent is the contract, because of which the
*status* is created. The contract being made by words *in praesenti*,
followed by cohabitation, fixes the *status*. Until the *status* is
fixed by cohabitation, either party to the making of the agree-
ment for a present marriage is a competent witness to estab-
lish the fact of the agreement, but after the agreement is made,
followed by cohabitation, the *status* is fixed, and then the parties
would thereafter come under the exclusion as to communications
and acts done between them, unless in the known presence or
hearing of a third party competent to be a witness, as is provided
in Subdivision 3 of Section 5241, Revised Statutes. There is
some of the testimony of this witness which we think will come
under this rule of exclusion, and the objection to all such testi-
mony is sustained, and, so limited, the testimony coming under
this rule is excluded, namely: acts done and conversations had
between these parties occurring after they had made the con-
tract and *commenced* to cohabit under the agreement as man
and wife, unless in the known presence of a third party, would
be incompetent and is excluded. But she is a competent witness
to prove the making of the contract, and to all acts and con-
versations between them until the marriage was consummated by
cohabitation after the agreement was made. She is a competent
witness under Section 5240, and not affected or rendered in-
competent under Section 5241 until the marriage *status* is fixed
by cohabitation.

"Cohabiting together as husband and wife means living to-
gether publicly in the face of society, as if the conjugal relation
existed; living in the same house, in like manner, as marks
the intercourse between husband and wife." *Bush* v. *State*, 37
Ark., p. 215.

"Cohabitation does not mean sexual gratification only, but
it means to live or dwell together, to have the same habitation,
so that where one lives and dwells there does the other live and
dwell also." *People* v. *Leahmesser*, 38 Pac., p. 422; 104 Cal.,
p. 631.

This leads us to the consideration of the legal question involved, namely: Is a common law marriage recognized as a valid marriage in Ohio? We state the proposition thus broadly for the reason that if no marriages other than such as are solemnized under and by virtue of the statutes of Ohio regulating marriages are valid, such a conclusion would be the end of this case so far as the rights of this child, Grace Helen Umbenhour, are concerned. We think the common law marriage is recognized in Ohio as a valid marriage, but we think conditions must attend to make it valid. We adopt as a correct exposition of the law on this subject the clear and succinct statement of Judge Phillips in his charge to the jury in the case of *Mieritz* v. *Insurance Company*, 8 N. P.—N. S., pp. 422-424, when he says:

"Marriage in Ohio may be ceremonial, as I will call it for convenience, or it may be by mere agreement and cohabitation, and without ceremony, and without license, and without the publication of banns. So that in Ohio, a man and a woman that are marriageable may become husband and wife by the official solomnization of a marriage, by virtue of a license or after the publication of banns and without a license, or by what is called a common law marriage. If a man and a woman that are marriageable agree between themselves to become husband and wife and they agree to become such at once, and they thereafter continuously cohabit as husband and wife, sustain the relation toward each other that is proper only for husband and wife, then the law says they are husband and wife. By such agreement to become husband and wife and by such cohabitation and carrying out of that agreement they become as legally and validly married as though they were married by official ceremony and by virtue of a license or by publication of banns. Cohabitation alone would not make them husband and wife, nor would the agreement if not consummated in the way I have stated make them husband and wife; but it is the agreement entered into at once, and the continued cohabitation in that relation, and the treatment of each other not only between themselves, but in the community, as husband and wife, that makes them such."

We believe this is the rule of law recognized by the great weight of authority in this country, and there is no conflict with the principle announced by Judge Phillips, unless it may be found in the reasoning of the judge announcing the opinion of

the Circuit Court in the case of *Bates* v. *The State of Ohio*, 9 C. C.—N. S., p. 273.

The record in that case as shown in the opinion of the court reversing the court below, fails to show any contract of marriage in that case, and the Supreme Court in affirming the circuit court and reversing the common pleas say in its memorandum of affirmance (77 O. S., pp. 622-623): "Judgment affirmed on the ground that evidence did not establish a common law marriage." This by no means sustains the contention that common law marriages are not recognized in Ohio. Without undertaking to cite generally the authorities outside of this state in sustaining such a marriage as we have in the case at bar, we will call attention to a few.

In the case of *Elizas* v. *Elizas*, 171 Ill., p. 632, s. c. 49 N. E., p. 717, affirming the 72 Ill. App., p. 94, the court held:

"Although the relation between the parties was in its inception meretricious, a marriage is sufficiently proven by the woman's testimony that they made a contract of marriage, the fact that they immediately moved from disreputable into respectable quarters and continued to live as man and wife, he introducing her as such, and on the birth of their child sent her congratulations," etc.

Where it appears, as in this case, that the intercourse between the parties was illicit at first, but subsequently is assumed a matrimonial character and was surrounded by evidence of cohabitation apparently decent and orderly, a presumption of more or less strength is raised that the parties have been duly married. While such cohabitation does not of itself constitute marriage, it tends to prove that a marriage contract has been entered into between the parties. Such conduct and cohabitation are in corroboration or tend at least to corroborate the testimony of the wife in her claim that a contract was entered into as testified by her. The principle as here stated is supported by many authorities and especially in the case of *Gall* v. *Gall*, 114 N. Y., p. 109.

One of the latest cases bearing upon a common law marriage is the case of *Travers et al* v. *Maria L. Reinhardt*, by the Supreme Court of the United States, reported in the May number,

May 15, 1907, of "All Opinions of the United States Supreme Court. Advance Sheets," page 563, where the court say in its second paragraph of the syllabus:

"Marriage—*Per verba de praesenti.* Persons whose alleged marriage in Virginia might have been invalid for want of a license had they remained there, might also for want of a religious ceremony have been invalid in Maryland, must be deemed married in New Jersey when as husband and wife they took up their permanent residence there and lived together in that relation continuously in good faith and openly, up to the time of the man's death, being regarded by themselves and in the community as husband and wife, since their conduct towards each other in the eye of the public while in New Jersey taken in connection with their previous association, was equivalent in law to a declaration by each that they did, and during their joint lives were to occupy the relation of husband and wife, which was as effective to establish the status of marriage in New Jersey as if it had been made in words of the present tense after they become domiciled in that state."

"A contract can not be implied as a matter of law, yet there may be an inference from facts proved, which fairly lead to the conclusion that there was a contract. When the conduct of parties are susceptible of two opposite explanations, the law assumes it to be *moral* rather than *immoral;* and credit is to be given to their own assertions whether expressed or implied, of a fact within their own knowledge." *Port* v. *Port,* 70 Ill., p. 484.

In *Hays* v. *People,* 25 N. Y., p. 390, the principle is stated thus:

"It is a settled rule in this state, and in many other states that a marriage in fact may be shown by proof of an agreement between two persons of opposite sex to take each other presently as husband and wife, consummated by cohabitation."

Without pursuing the discussion further on authority or otherwise, we are of the opinion, and so find, that these parties were legally married; that Grace Helen Umbenhour is the legitimate child of such marriage, and is an heir of the said Willard P. Umbenhour, and is entitled to one-third interest in the premises described in the petition, and is entitled to the relief prayed for in the answer and cross-petition of the defendant, John J. Weffler, guardian of said Grace Helen Umbenhour. And an order of partition is ordered in accordance with this finding and

decree. To which finding and decree the plaintiff excepts. Motion for new trial filed and overruled; exceptions; statutory time for bill of exceptions; twenty days for separate finding of facts and conclusions of law.

DONAHUE, J.

The opinion already written by my associate so fully covers every question in this case that I do not care to discuss any of them at length, but simply to give my reasons for concurring in the majority opinion.

I agree with both of my associates upon the question that there may be a valid common law marriage in Ohio, and the essential elements necessary to constitute such a marriage. It may be a matter of regret that such is the law, but it is not the province of the court to legislate upon such subjects; we have discharged our full duty when we declare the existing law and apply it to the facts and circumstances of the case at issue. I do not agree with our dissenting associate that the correct solution of this case depends entirely upon the evidence of the witness calling herself Margaret Umbenhour. True, we must have recourse to her evidence, for any oral evidence touching the contract *in praesenti,* and if her evidence in that behalf were not corroborated by other facts proven in this case I would very readily agree with the contention of counsel for plaintiff and defendant, Hazel Umbenhour, not that the witness so unfavorably impresses me as to discredit her own evidence in that behalf, but the language that she stated was used in the making and entering into this contract is hardly the language that you would expect persons in their situation and condition of life to use; but, notwithstanding that fact, it is just as certain that some change came into their lives about that time. It is undisputed in this evidence that about that time, or within two weeks thereafter, and just as soon as the hotel could secure another laundress, this woman gave up her position there and went to live with Willard P. Umbenhour, and their relations thereafter were to all intents and purposes the same as the relations of husband and wife. Willard P. Umbenhour shortly thereafter told a friend of his that he had been married at Wooster, and to whatever persons

they came in contact with in Massillon during the remainder of the time they lived there, they introduced each other as husband and wife, and after they removed to Alliance their relations were such and conduct was such, and their treatment of each other and the child was such as it would have been had they in truth and fact been married. So that every thing that follows up until the death of Willard P. Umbenhour from and after this claimed contract or pledge was made is perfectly consistent with the claim, and especially the fact that he took Margaret to the funeral of his uncle and there introduced her to his relatives as his wife. It is true that prior to his death and after the birth of the child, he said to Margaret, "now, we ought to be married," but this does not necessarily preclude the possibility, or even the probability, of a common law marriage having taken place between them; for I am inclined to the belief that even though all transpired that has been testified to by Margaret, yet these people were, perhaps, of the opinion that they were legally married, but their opinion upon the subject is not important. If this were a criminal prosecution of Margaret or Willard for bigamy, or a prosecution against Willard for failure to provide, his mere opinion as to whether he had or had not been legally married to Margaret would be of no avail, but the case would be determined upon the facts proven, and not otherwise.

I am also thoroughly in accord with what is stated in the dissenting opinion, as to what these people should have done had they had any decent regard for society or for the welfare of their offspring; but I am not in accord with the statement that a court ought not, at the expense of two innocent children, divide their patrimony and give it to their unfortunate child. This child is just as innocent of wrong as the two children who are conceded to be legitimate. Its rights are just as sacred to this court, and ought not to be sacrificed upon the mere suspicion or mere possibility that Margaret Labus or Margaret Umbenhour is telling an untruth. This child has much more at stake in this litigation than the dollars and cents it will acquire in this partition suit, and if it is in fact legitimate these other children, Lee and Hazel Umbenhour, are interested and ought to be concerned

in having its legitimacy determined, even if by doing so their share of the patrimony should be less, yet it is certainly to their advantage, and ought to be a source of great gratification to them, and certainly will be when they reach more mature years, to know that their half-sister is legitimate, and that the last hours of their father's life was not spent in criminal relations with the mother of this child. But these considerations by no means determine the questions at issue. The evidence must control, no matter who it helps or hurts.

These matters are referred to only as showing the gravity of the case and the care and consideration that courts should exercise in determining the rights of the respective parties, and after careful and mature consideration of all this evidence I have reached the conclusion that there was such a contract *in praesenti* as the law requires, and that such contract was followed by a change in the relations of the parties, and was followed by cohabitation and the holding each other out to the world as husband and wife, and that by reason thereof there was a valid common law marriage between Willard P. Umbenhour and Margaret Labus, and that the defendant, Grace Helen Umbenhour, was and is the legitimate child and heir of Willard P. Umbenhour, and as such comes within the provisions of the deed of Jacob Umbenhour to Willard P. Umbenhour for "his natural life, and to the heirs of his body, if any he have."

TAGGART, J.

I can not concur with the judgment of the majority of the court for the following reasons:

On December 1, 1887, Jacob Umbenhour by deed conveyed to Willard P. Umbenhour the undivided one-fourth part of certain premises in Stark county, Ohio, during the natural life and "to the heirs of his body, if any he have." There are other provisions in this deed, but they are unnecessary to note in the determination of this case.

Willard P. died February 14, 1907. Lee and Hazel Umbenhour claim to be the only heirs of his body, and if found to be such are entitled to the property involved in this case.

It is not disputed that these two are the children of Willard P. and Lucy Umbenhour, born in lawful wedlock. Willard P. and Lucy were divorced some time in February, 1901.

On October 3, 1902, Grace Helen, a daughter of Willard P. and Margaret Labus, was born, and through her guardian, claims the undivided one-third of this property. On her behalf the claim is made that, after the divorce of Willard P. and Lucy, that Willard P. and Margaret Labus on May 12, 1901, entered into a consensual marriage, and that this relation existed until the death of Willard in 1907.

The evidence fully establishes the fact that, prior to the divorce of Willard and Lucy, the relations between Willard and Margaret Labus were illicit, and continued so until, as she claims on May 12, 1901, they agreed to become husband and wife. The only evidence of the contract of marriage is found in the testimony of the witness, Margaret Labus. She says, in speaking of their relations, that "Before the divorce the same were illicit." "After he was divorced he said to me, 'Mag, you get the blame and we might as well have the game.' So he said, we will be married, and it went on till May." Then in May, down in his room, she says the following took place: "Well, in May—it went on till May, and Billy said to me, the court won't give us no license, and he took my hand and he said, 'I pledge myself as a true and lawful husband to you the longest day I live.' And I said to Billy, I pledge myself as a true and lawful wife to you the longest day I live.' He slipped his mother's wedding ring on my finger, and he kissed me, and he said, 'if we have any children, they will hold us together.' " These are the words of the contract or agreement *in praesenti*, which, it is claimed, fixed the status of these parties, as there is proof of cohabitation continuing from about this time until the death of Willard in 1907. This agreement was the only contract claimed to have been made between these parties, and there is no claim of any other, or different, contract or marriage ceremony. *This case rests on the truth or falsity of this testimony.*

If this story, taken in connection with all the circumstances of the case, is unworthy of belief, then the claim of Grace Helen to part of this property must fail.

A witness is entitled to be believed unless impeached by other witnesses on his own story, or discredited by the circumstances of the case.

*This witness is impeached by her own story.* She gave an altogether different account of her relations with Willard shortly after his death. She then claimed that she had been married by a minister on a large body of water, a distance from the shore. She explains that she gave this account of her marriage because she was ashamed to tell the truth. She tells this story shortly after Willard's death, when she did not have the time to fully make up or invent the story that she now tells. This contract or pledge was kept a profound secret; never brought to light until testified to in court. Both of these parties knew that the usual and ordinary way to enter into the marital relation was in public, and by employing the offices of priest, minister or magistrate. It is not shown that either knew that the marriage relation might be entered into without a solemnization by a magistrate or minister. It does not appear from the proof that either knew that this so called pledge had any binding force or effect. On the contrary, there is proof that they did not deem it binding or valid.

Recurring to the testimony of Margaret: "Willard said, before his death, *'we ought to be—we ought to get married now.'* *"And what did you say? Did you agree to that?"* "Why, sure I did." "Did Billy speak about getting a license and getting married after May 12, 1901, and up to the time of his death?" "Not until up until a little while before his death."

There is not a single declaration or admission of either of these parties as to the fact that a marriage ceremony, or a marriage contract, as testified to by Margaret, had taken place.

While Willard P. entered the name and date of birth of Grace Helen in the fly leaf of the Bible, with that of his other children, he does not enter the fact of this marriage, or the date of it in the Bible, or, in connection with the date of the birth of Grace Helen. He, in fact, knew that his marriage with Lucy was a matter of record and its proof easy. He does nothing to bring to light the secret and unusual transaction, as testified to by Margaret Labus. The witness herself says that she never told any

one how or when they were married or told the story she now tells.

*The story of the pledge is not credible.*    The language employed is not such as persons situated as these persons were, would employ.   Nor would they employ this manner of getting married. The proof does not show that either ever knew of such a formula being employed, or of such a marriage ever having taken place. It is consent or agreement, and not cohabitation, that fixes the *status* of marriage, and this consent, or agreement, is not established by the proof.   *The circumstances of the case are . against the claim that there was a marriage and not a mere continuation of the illicit relation.*

The following rules are well established, understood and supported by abundant authorities:   Relations illicit at the inception, when there is no impediment to marriage, the presumption is, that their continuance is of the same character.   The fact that a woman assumes a certain name is not any evidence that she is married to the man of that name.

Acknowledgement of marriage.    Marriage will not be presumed from mere acknowledgement, when the acknowledgement is as referable to improper relations as to matrimonial; or when it appears that the acknowledgement is made to conceal the unlawful relation.    Mere reputation that parties are husband and wife is not enough to warrant a presumption of marriage.    This reputation must be general and uniform.

Proof of change in relations.    The evidence must establish that the change was referable to the contract of marriage, or to a valid marriage, or the presumption will obtain that the illicit relations continue.

That there was any change in the relation of these parties can not fairly be claimed.   Their association before this so-called pledge was meretricious, and they made no change, except to continue the relations *more openly; carefully concealing the fact that anything like the semblance of a marriage had taken place.   Had either of these parties desired to make public the fact that they were not continuing their former relations, but that they had in fact been married as claimed, it could easily and surely have been done by stating the fact to relatives or

acquaintances, in the presence of the other, and silence or the admission of the fact would have been proof that it had taken place. The very fact that during these years no such admission or public declaration was made by either, negatives the idea that the pledging ever took place, and the holding out was, in fact, to cover a relationship that was improper. The writing of the name "Grace Helen" in the Bible, and the acknowledgment of her as their child, does not establish a marriage. She was their child, but the acknowledgement does not prove that she was born in wedlock. Many a natural father has acknowledged his child, and acknowledged the mother of the child as its mother, but that does not establish the fact that she was his wife. He said in his last days, "He wished that Grace might share with the other heirs." Had there been a contract between these parties, dating from May, 1901, and it was believed or known that it was binding, why thus wish that the child might share with his other children?

Finally, there is no reason given for their taking up with each other, and living as they did, if they desired to change their meretricious relation to one matrimonial. They knew that people in these days, in a respectable community, publicly unite in marriage, so that their *status,* and that of their children, will not be left to any uncertainty. They knew that a public marriage is deemed and held respectable, and that a secret one is looked on with suspicion. Did they desire to make amends for their past conduct, they would have been married publicly by a magistrate or a minister. Even after the birth of their child, if they had any regard for its future, they would have made some permanent provision, so that its rights would not have been left to very uncertain testimony of a single witness and its legitimacy left in doubt. Their conduct is only explained by the belief that they were never married, or that they never had any regard for their child, or hoped that some court, at the expense of two innocent children, would divide their patrimony, and give it to their unfortunate child, thus giving it a *status* and legitimacy which they, without a decent respect for the usages and customs of respectable society, had denied it.